Bobby WILLIAMS, Plaintiff–Appellant,

v.

Robert B. GREIFINGER, Deputy Commissioner and Chief Medical Officer of the New York State Department of Correctional Services, Defendant–Appellee.

No. 1966, Docket 96–2163.

United States Court of Appeals, Second Circuit.

Argued Aug. 5, 1996.

Decided Oct. 15, 1996.

Mitchell A. Karlan, Gibson, Dunn & Crutcher, New York City, for Plaintiff-Appellant.

Barbara K. Hathaway, Attorney General's Office, State of New York, New York City, for Defendant-Appellee.

* Honorable Louis H. Pollak of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. Greifinger's successor as Deputy Commissioner and Chief Medical Officer of DOCS, Lester

Before: CALABRESI and PARKER, Circuit Judges, and POLLAK, Senior District Judge.*

LOUIS H. POLLAK, Senior District Judge:

Plaintiff Bobby Williams, an inmate at Sing Sing Correctional Facility, seeks to challenge a policy under which he was held in a status called "medical keeplock" for 589 days, without any opportunity for out-of-cell exercise, as a result of his refusal to take a tuberculosis test. Claiming that this policy's bar on out-of-cell exercise violated the Eighth Amendment, he has brought suit, under 42 U.S.C. § 1983, against Robert Greifinger, who was Deputy Commissioner and Chief Medical Officer of the New York State Department of Correctional Services ("DOCS") during Williams's confinement in medical keeplock.[1] Greifinger was instrumental in designing and authorizing the medical keeplock policy. In response to cross-motions for summary judgment, the district court ruled that the medical keeplock policy did indeed violate the Eighth Amendment, but that Greifinger is immune from suit under the doctrine of qualified immunity. Williams now appeals from the latter ruling.

## I. BACKGROUND

Except where noted, the following recitation of facts is not disputed by the parties.

There has been a broad increase in tuberculosis ("TB") infection nationwide. Prisons have been particularly affected by this trend; prison inmates tend to be in poorer health than the general population, and so are more susceptible to contagion. The nature of prison life also facilitates disease transmission. As a result, in the three years preceding the end of 1993, there were 27 deaths from TB in the prisons of New York State, including that of one correctional officer.

In late 1991, DOCS responded to the rise in TB infection by instituting a tuberculosis

Wright, reviewed and amended the medical keeplock policy to allow one hour of out-of-cell exercise per day. This appeal concerns only the policy as administered during Williams's confinement.

control program. A few important facts about TB itself will aid in explaining the nature of this program. TB infections take two forms, "latent" and "active" cases. Persons with latent TB are infected with the bacterium that causes TB, but have no obvious symptoms, and are not ordinarily contagious. Persons with active TB, by contrast, have symptoms (including coughing, sweating, and fever) and are contagious. A prisoner who is known to have latent TB can be given a course of treatment, termed "INH therapy," which will greatly reduce the risk that he or she will develop active TB. (Generally, however, a latent TB infection cannot be eliminated altogether.)

Active TB can be detected through sputum samples and chest x-rays. Latent TB is detected through the purified protein derivative ("PPD") test, which involves injecting a compound under the skin; in individuals with latent TB, the injection will cause a skin reaction. The test causes side effects in some, including "redness, soreness, or an open lesion"; these side effects do not, however, pose a serious health risk. Joint App. at 32.

Under DOCS's program, inmates and staff at facilities under DOCS's authority are tested for latent TB on arrival, and retested annually thereafter. Individuals who are found to have latent TB are provided the option of receiving INH therapy. (Because the therapy can have serious side effects, including liver damage, it is not mandatory.) All inmates with latent TB are monitored for the clinical symptoms suggestive of active TB, and periodically given chest x-rays. Inmates with latent TB are not, however, removed from the general prison population. By contrast, inmates with active TB are placed in "respiratory isolation"; that is, these inmates do not share a common breathing space with persons who do not have active TB.

This case is about what happened to inmates who declined to take the PPD test—the test for latent TB—during Greifinger's tenure as Chief Medical Officer of DOCS.

DOCS did not administer the PPD test without an inmate's consent. Instead, inmates who declined to take the test were counseled about the test, and encouraged to consent to it. If they continued to refuse, they were placed in a status called "medical keeplock." Inmates in medical keeplock were not permitted to leave their cells, except for a ten-minute shower once a week. Also, they were not permitted to receive visitors, except their attorneys. These conditions, particularly the bar on out-of-cell exercise, were more stringent than those imposed on prisoners in solitary confinement, who were permitted an hour of exercise daily.

Somewhat surprisingly (given its name), medical keeplock apparently involved few safeguards against contagion. Inmates in medical keeplock were counseled regularly about the benefits of consenting to the PPD test. However, prison personnel who interacted with the inmates did not wear masks, and the air the inmates breathed was not filtered or sectioned off in any way from that circulating in other parts of the prison. Moreover, the inmates did not wear masks during their showers or when they met with their attorneys—meetings which, at least in the facility at issue in this case, occurred in the prison's visiting room, an area presumably frequented by members of the public. See *Jolly v. Coughlin*, 894 F.Supp. 734, 738 (S.D.N.Y.1995) (describing keeplock policy at Sing Sing Correctional Facility), *aff'd*, 76 F.3d 468 (2d Cir.1996).

The plaintiff in this case, Bobby Williams, is imprisoned at Sing Sing Correctional Facility. According to his complaint, on March 2, 1993, he refused a PPD test; the refusal was based on his claim that after a PPD test in December 1991 he had experienced a "very mysterious breathing problem." Joint App. at 8. As a result of the 1993 refusal, Williams was placed in medical keeplock, where he remained for 589 days, receiving regular counseling about the virtues of PPD testing, but no exercise outside his cell.[2] On October 12, 1994, Williams gave up and ac-

---

2. Williams did apparently leave his cell for a few trips to the facility hospital. Joint App. at 305. Also, he was transferred to another prison for two weeks; he made the journey on a large bus with other inmates and staff members. *Id.*

cepted a PPD test. He was then returned to the general prison population.

After exhausting prison grievance procedures, Williams filed a *pro se* complaint in the district court in January of 1995, seeking damages for the "inhumane condition of confinement" he had experienced. Joint App. at 9. Williams named as a defendant Robert Greifinger, Deputy Commissioner and Chief Medical Officer of the New York State Department of Correctional Services. Greifinger was then DOCS's chief medical official and was responsible for developing the medical keeplock policy. In March of 1995, Williams moved for summary judgment, seeking a finding that his constitutional rights had been violated as a matter of law. Greifinger cross-moved for summary judgment, asserting (1) that he should prevail under the Eighth Amendment, and (2) that he was immune from suit under the doctrine of qualified immunity. Although the parties supplied the district court with a number of affidavits, no discovery preceded the motions.

The district court found that Williams was entitled to summary judgment on the Eighth Amendment claim, stating that "[t]he cases ... show that the total denial of exercise is a serious deprivation of basic human needs, and that defendant, by helping to formulate and then approving the challenged policy, was deliberately indifferent to the excessive risk that this deprivation posed to the plaintiff's health." *Williams v. Greifinger,* 918 F.Supp. 91, 96 (S.D.N.Y.1996).

As to the qualified immunity question, however, the district court found that Greifinger was entitled to summary judgment. Under the law of qualified immunity, government officials may only be sued for violations of "clearly established" rules of federal law. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Even then, they lose their immunity only if it was "objectively legally unreasonable" for the officials to have believed their actions did not violate these rules. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see also In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir. 1996). The district court found that it was possible to read pre-existing law, specifically

this court's decision in *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971) (in banc), as permitting an inmate to be denied exercise if that inmate was given the "keys to his cell"— that is, if the inmate had the power to end his own confinement by cooperating with prison rules. *Williams,* 918 F.Supp. at 97. Therefore, the district court held that it was not clearly established during the period of Williams's confinement that the conditions of medical keeplock violated the Eighth Amendment, and that it was objectively reasonable for an official to believe that the keeplock policy was constitutional. Accordingly, the district court granted summary judgment to Greifinger. Williams now appeals this decision.

This court has jurisdiction over Williams's appeal pursuant to 28 U.S.C. § 1291. Because Williams appeals from a grant of summary judgment, our review is plenary; that is, "[w]e examine the record *de novo,* and we are required to view the evidence in the light most favorable to the party opposing summary judgment." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995).

## II. ANALYSIS

We note at the outset that DOCS's medical keeplock policy has already been the subject of some litigation. Most notably, in *Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996), this court upheld a preliminary injunction issued by a district court requiring DOCS to release an inmate, Paul Jolly, from keeplock pending a decision on the merits of his suit challenging the keeplock policy. Jolly, a Rastafarian, averred that his religion prohibited him from accepting "artificial substances into the body," *id.* at 476, thus precluding him from taking a PPD test; he challenged the medical keeplock policy both under the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb to 2000bb-4, and under the Eighth Amendment. As to Jolly's Eighth Amendment claim (the claim relevant here), the district court found that it was "very likely" that Jolly would succeed on the merits of this claim, and described the conditions of medical keeplock as "abhorrent to any rudimentary sense of humanity." *Jolly,* 894

F.Supp. at 748.[3] On appeal, this court agreed that Jolly had demonstrated a substantial likelihood of success on the merits. *Jolly*, 76 F.3d at 480–82.

Greifinger has not appealed the district court's finding that Williams's detention in medical keeplock violated the Eighth Amendment. Furthermore, the medical keeplock policy has been modified to allow inmates in medical keeplock an hour of out-of-cell exercise daily. Our task is therefore limited to the question whether the district court was correct in granting summary judgment to Greifinger on the issue of qualified immunity.

We will begin by briefly summarizing the relevant rules of qualified immunity law. Drawing on these rules, we will then undertake to identify the "clearly established" contours of the Eighth Amendment right to exercise as they existed at the time of Williams's confinement in medical keeplock. We will consider whether DOCS's justifications for denying Williams exercise were consistent with this clearly established law. Finally, we will examine whether it was "objectively reasonable" for Greifinger to believe that such a denial was constitutional.

## A. Qualified Immunity

■ The Supreme Court held in *Harlow v. Fitzgerald* that "government officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. The question whether law is "clearly established" turns on an analysis of whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. A court need not have passed on the identical course of conduct in order for its illegality to be "clearly established"; however, "in the light of pre-existing law the unlawfulness must be apparent." *Id.; see also Ayeni v. Mottola*, 35 F.3d 680, 686 (2d

Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995).

■ Even if the applicable law was clearly established when the purported violation occurred, however, officials may still successfully assert qualified immunity if they can show that their actions were "objectively reasonable." *See Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996); *Genas v. New York Department of Correctional Services*, 75 F.3d 825, 830 (2d Cir.1996); *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995). That is, officials seeking to establish qualified immunity must undertake to show that "reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *In re State Police Litigation*, 88 F.3d at 123.

■ Summary judgment on the basis of a claim of qualified immunity is thus appropriate only

> if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

*Id.; see also Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987); *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, J., sitting by designation).

## B. The "Clearly Established" Contours of the Right to Exercise

### 1. The Implications of Sostre v. McGinnis

■ This court first addressed the outlines of the Eighth Amendment right to exercise in *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.1971) (in banc), a case that remains this court's most detailed pronouncement on the nature of that right. The plaintiff in that case, Martin Sostre, was a prison inmate who brought a multi-faceted challenge to his con-

**3.** The plaintiff in *Jolly*, who was kept in medical keeplock for three and a half years, became "unable to stand to go to the shower and ...

suffer[ed] from soreness, rashes, headaches and hair loss." 894 F.Supp. at 748.

ditions of confinement. An element of that challenge was directed at his prolonged detention in solitary confinement, as well as at the particular circumstances of that confinement, including his "diet, his opportunity for exercise, [and] the hygienic conditions of his cell." *Id.* at 186.

Judge Kaufman, in his opinion for the majority of the in banc court, concluded that prolonged solitary confinement under the particular conditions experienced by Sostre did not violate the Eighth Amendment. His opinion stated that "[i]n arriving at this conclusion, we have considered Sostre's diet, the availability in his cell of at least rudimentary implements of personal hygiene, the opportunity for exercise and for participation in group therapy," the availability of reading material (including law books), and the possibility of communicating with other prisoners in solitary confinement. *Id.* at 193–94 (footnotes omitted). In a footnote, Judge Kaufman noted that the availability of exercise "distinguishes the instant case from *Krist v. Smith,* 309 F.Supp. 497, 501 (S.D.Ga.1970), where the court found no constitutionally acceptable justification for denying segregated prisoners a chance to exercise." *Id.* at 194 n. 25.

In our view, there are three relevant lessons to be drawn from *Sostre.* First, *Sostre* established that the availability of exercise is a key ingredient of a court's analysis whether an inmate's conditions of confinement pass muster under the Eighth Amendment.[4] We will not dwell on the question whether *Sostre* took the further step of deciding that the Eighth Amendment actually requires that prisoners receive some opportunity for exercise (although the above-quoted footnote strongly suggests that it did), because this court has since settled that question. In 1985, in *Anderson v. Coughlin*—six years before the formulation of the DOCS regime

at issue in the present case, and eight years prior to the onset of Williams's confinement in medical keeplock—we described the right to exercise in unequivocal terms, stating that "[c]ourts have recognized that some opportunity for exercise *must* be afforded to prisoners." 757 F.2d 33, 35 (2d Cir.1985) (emphasis added).[5]

Second, *Sostre* implicitly established an important limitation on the Eighth Amendment's exercise guarantee, which we will term the "safety exception." Judge Kaufman's recitation of facts in *Sostre* noted that all prisoners in solitary confinement were allowed an hour of exercise daily in "a small, enclosed yard, open to the sky." 442 F.2d at 186. Judge Kaufman also observed, however, that

> the record reveals that Sostre refused this privilege because he would not submit to a "strip search." Officials testified that it was necessary to subject prisoners to such an examination each time they entered the exercise yard to prevent them from concealing on their bodies small bits of wire or other material suitable for use as a weapon.

*Id.* Despite this limitation on Sostre's exercise privileges, Judge Kaufman went on to state later in the opinion that Sostre had an "opportunity for exercise," *id.* at 193—thus implicitly finding that safety rules like the strip search referred to above did not improperly burden Sostre's ability to exercise.

Two other courts of appeals have since agreed that restrictions on exercise must be limited to "unusual circumstances," or circumstances in which exercise is "impossible" because of disciplinary needs. *Mitchell v. Rice,* 954 F.2d 187, 192 (4th Cir.), *cert. denied,* 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992); *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979). The courts found that the fact that an inmate is violent

---

4. Indeed, *Sostre* was among the first opinions—if not the first opinion—of any court of appeals to come to this conclusion.

5. We went on to hold that the opportunities for exercise available in the two prisons at issue in that case were adequate. *See* 757 F.2d at 36.

    The pertinent court of appeals decisions of which we are aware—that is, those decided before Williams was put in medical keeplock in March 1993—are uniform in concluding that the

Eighth Amendment requires that prison inmates be allowed some out-of-cell exercise. *See, e.g., Mitchell v. Rice,* 954 F.2d 187, 192 (4th Cir.), *cert. denied,* 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992); *Davenport v. DeRobertis,* 844 F.2d 1310, 1315 (7th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Toussaint v. Yockey,* 722 F.2d 1490, 1492–93 (9th Cir.1984).

may justify segregating him or her from the general prison population, but does not necessarily justify a prison's failure to make "other exercise arrangements"; further, they agreed that prisons may not invoke cost considerations in denying prisoners the opportunity to exercise. *Mitchell,* 954 F.2d at 192; *Spain,* 600 F.2d at 200. *Mitchell* also illustrates the skepticism with which restrictions on prisoners' ability to exercise are properly viewed: the *Mitchell* court specifically found that it would not be possible to grant summary judgment to prison officials on their claim of qualified immunity, even in the case of an inmate who had been denied exercise because of his "incorrigibly assaultive nature," without "[a] detailed review of the feasibility of alternatives ... such as solitary out-of-cell exercise periods, or the adequacy of in-cell exercise." *Mitchell,* 954 F.2d at 193.

The third important conclusion to be drawn from *Sostre* is that the court in no way endorsed the proposition that a prisoner who "holds the keys to his cell" may be subjected to treatment which would otherwise be impermissible under the Eighth Amendment. The appellees are therefore mistaken in contending (and the district court was mistaken in agreeing) that *Sostre* can be read to support this proposition.

6. An example of such a rule cited in *Sostre* was the requirement that inmates in solitary confinement participate in group therapy. Inmates who declined to do so—as Sostre did—were released less promptly from solitary confinement, and could indeed be held in solitary confinement indefinitely. *See* 442 F.2d at 185–86.

7. Judge Kaufman found that a court must consider, in addition to the conditions of the inmate's confinement, the duration of that confinement and "the mental and physical health of the inmate." 442 F.2d at 193 n. 23.

8. Judge Kaufman did briefly consider the implications of the contingent nature of Sostre's confinement. He did so in response to a dissenting and concurring opinion written by Judge Feinberg, who found that indefinite solitary confinement of the sort to which Sostre had been subjected necessarily violated the Eighth Amendment. In the course of his analysis, Judge Feinberg observed that the fact that Sostre could end his own confinement by participating in group therapy did not change this result, noting that, if it did, one might also conclude that it was permissible to torture Sostre

The *Sostre* court did find that, in the particular circumstances addressed in that case, the Eighth Amendment did not prohibit the warden of Green Haven Prison from placing Martin Sostre in solitary confinement "until such time as [Sostre] agrees to abide by prison rules." 442 F.2d at 193.[6] However, Judge Kaufman's majority opinion also made clear that such confinement was only permissible if the conditions of the inmate's solitary confinement met the minimum standards imposed by the Eighth Amendment. *See* 442 F.2d at 193 n. 23.[7] His opinion reviewed Sostre's conditions of confinement, including Sostre's "opportunity for exercise," in some detail, and found them to be constitutionally permissible. *See* 442 F.2d at 193–94. One could say that Sostre "held the keys to his cell" in the sense that by agreeing to comply with prison rules he could have achieved release from segregation; but, as Judge Kaufman's opinion made clear, that fact in no way relaxed the court's inquiry into the adequacy of the conditions to which Sostre was subjected.[8]

## 2. Other Proffered Support for DOCS's Medical Keeplock Policy

Notwithstanding *Sostre,* Greifinger maintains that reasonable minds could differ as to

until he cooperated. *See* 442 F.2d at 208 (Feinberg, J., dissenting and concurring).

Judge Kaufman's majority opinion responded to Judge Feinberg thus:

Judge Feinberg is also properly concerned with "endless solitary confinement * * * unless the prisoner 'gives in.'" Our response is that we are concerned also. But one must ask on what was it that Sostre was expected to "give in." He was asked to show a change in his intransigent defiance of several prison regulations, defiance which posed a credible threat to the security of the prison, by attending group therapy sessions. Does it violate principles of fundamental decency to insist that a prisoner comply with reasonable rules applicable to all similarly situated?

*Sostre,* 442 F.2d at 193 n. 23. This passage does not treat the contingent character of Sostre's confinement as though it might weaken the applicable Eighth Amendment standard. Rather, it is directed at rejecting the claim that the use of solitary confinement to induce Sostre to comply with prison rules and attend group therapy sessions might heighten the appropriate degree of Eighth Amendment scrutiny.

whether DOCS's medical keeplock policy was constitutional as administered at the time of Williams's confinement. In support of this contention, he points to three opinions from trial courts which he claims approved the policy.

As an initial matter, we note that this court has previously indicated that the germane law in determining whether a right is clearly established for purposes of qualified immunity is "the decisional law of the Supreme Court and the applicable circuit court." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)). Moreover, Greifinger is mistaken in believing that any of the opinions on which he relies found that the conditions of confinement of prisoners in medical keeplock did not violate the Eighth Amendment. Two of them (each the "Report and Recommendation" of a federal magistrate judge) never touched on this question. *See Johnson v. Keane,* No. 92 Civ. 4287 (S.D.N.Y. Apr. 30, 1993), *adopted,* 1994 WL 37790 (S.D.N.Y. Feb. 9, 1994); *Payne v. Coughlin,* No. 93 Civ. 3378 (S.D.N.Y. Oct. 12, 1994).[9] The third, a decision of the New York Supreme Court, *Jolly v. Keane,* No. 15385/92 (N.Y. Sup.Ct., Westchester County, Dec. 22, 1992), did state in dicta that DOCS was "of course, free to exercise [its] discretion regarding visitation and shower privileges." Joint App. at 118. This statement, however, does not address DOCS's exercise policies, the question at issue in the present case.[10]

In short, Greifinger has been unable to adduce any judicial support for his claim that the right to exercise was not clearly established by the time of Williams's confinement in medical keeplock. In light of *Sostre* and the other cases discussed above, we find that the right to exercise was by then indeed clearly established.

### C. Application of the "Objectively Reasonable" Standard to the No–Exercise Policy

■ We must now examine whether it was nonetheless "objectively reasonable" for Greifinger to believe that depriving Williams of exercise did not violate a clearly established right. If "no rational jury could fail to conclude" that such a belief was reasonable, then the district court's decision granting summary judgment to Greifinger must be sustained. *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir.1996). If, however, a rational jury could decide otherwise, then the grant of summary judgment must be reversed.

We note first that Greifinger has made no claim that there existed "extraordinary circumstances," *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), making him in particular justifiably ignorant of the relevant law. *See Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); *Security and Law Enforcement Employees v. Carey,* 737 F.2d 187, 210 (2d Cir.1984). There remains, then, the question whether Greifinger could reasonably have believed that his conduct was within the safety exception implicitly embraced by *Sostre v. McGinnis.*

Greifinger has not argued that providing Williams with an opportunity for exercise would have posed an immediate danger of contagion. Nor does it appear that Greifing-

---

**9.** *Johnson v. Keane* primarily involved an inmate's challenge, under the Fourth, Eighth and Fourteenth Amendments, to the PPD test itself. The plaintiff also challenged the medical keeplock policy, but only insofar as it lacked, he maintained, procedural due process protections. The district court, adopting the magistrate judge's recommendation, granted the defendants' motion for summary judgment. *Payne v. Coughlin* concerned an inmate's substantive due process claim that DOCS's TB testing policy as a whole was medically unreasonable. The magistrate judge's report, recommending that the plaintiff's motions for temporary restraining or-

ders be denied, was never ruled upon; apparently, the plaintiff was paroled and the case thereby mooted. Joint App. at 108.

**10.** *Jolly v. Keane* mentioned exercise only once, to note that Jolly was kept in medical keeplock "without exercise or visitation." Joint App. at 113. The opinion focused, instead, on balancing the inmate's rights under the Free Exercise Clause against the institutional needs of the prison, a balance which the court determined should weigh in favor of the prison.

er could reasonably have believed that this was true. Williams was never treated as though he posed any immediate danger of contagion to fellow inmates or prison staff. Indeed, even if Williams had taken the PPD test and been found to have latent tuberculosis, he would, under DOCS's policies, have been returned to the general prison population. Greifinger can therefore hardly assert that an hour of daily exercise for Williams would have posed any risk of contagion.[11]

Greifinger does argue that permitting inmates who have not been screened for TB to come into contact with the general prison population could have given rise to fear and disruption among inmates and staff. It is difficult to imagine that this argument is intended seriously, given that (1), as we have already observed, inmates with latent TB were permitted to remain in the general inmate population; and (2) any concern about whether an inmate has active TB could be speedily resolved through a sputum test or an x-ray.[12] Moreover, even if permitting Williams to come into contact with other inmates (or prison staff) would have caused discomfort, this would not justify denying Williams some opportunity to exercise; Williams could, if necessary, have exercised alone. Nor, as we have already observed, may DOCS argue that it would be too costly to provide Williams with separate exercise arrangements. *See Mitchell,* 954 F.2d at 192; *Spain,* 600 F.2d at 200.

We therefore conclude that it would not have been "objectively reasonable" for a prison official to believe that the possibility of inmate or staff unrest, or of contagion, would suffice to trigger the safety exception to the right to exercise.

### D. *Summary Judgment*

In section II.A. of this opinion, we set forth the summary judgment standard, with respect to the issue of qualified immunity, articulated by this court in *In re State Police Litigation.* We repeat that standard now: Summary judgment on the basis of a claim of qualified immunity may be granted only

> if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

88 F.3d at 123. Applying the two prongs of that test to the case at bar, we decide, first, that the right to exercise asserted by Williams was clearly established at the time of his confinement; and second, that a rational jury could indeed conclude that it was not objectively reasonable for Greifinger to be-

11. There is also no indication in the record that DOCS had reason to suspect that Williams had *active* tuberculosis. In any event, DOCS could readily have determined whether or not this was true with an x-ray and/or sputum test. Nothing in the record suggests that Williams would have objected to either of these procedures.

12. Greifinger suggests on appeal that other inmates may not have understood the distinction between latent and active TB, and could have treated untested inmates as though they posed a risk of active, rather than latent, TB. It is true that the term "medical keeplock" might conceivably have created fears of contagion among other inmates. But this problem would seem to be attributable almost entirely to DOCS's decision to frame a policy whose immediate goals were coercive, not medical, in terms of immediate medical necessity. DOCS could have countered this difficulty through some combination of (1) changing its (mildly Orwellian) terminology, (2) better explaining the keeplock policy to inmates,

and (3) testing all inmates in medical keeplock for active TB, thereby eliminating concerns about contagion.

The record contains a number of instances in which DOCS staff suggest, in affidavits or deposition testimony, that the true purposes of the medical keeplock policy were coercive, and had little to do with concerns about prison safety. Indeed, Greifinger himself, in a deposition conducted in *Jolly v. Greifinger* and submitted in support of Greifinger's motion for summary judgment in the case at bar, stated that "[t]he penologic solution to inmates who don't cooperate is not to force the test, because I do not believe that that would be humane. But it is to administer a remedy, which will get as many inmates as possible to voluntarily agree to be tested. We have been very, very successful. 99.7 percent of our inmates have undergone testing...." Joint App. at 195–96. Or, as Greifinger observed more concisely in a memorandum dated November 19, 1991, "Inmates who refuse testing will be locked up." Joint App. at 63.

lieve that in denying Williams the right to exercise he was "acting in a fashion that did not violate a clearly established right." Thus, Greifinger's claim of entitlement to qualified immunity satisfies neither prong of the standard. The decision granting Greifinger summary judgment must, therefore, be reversed.

### III. CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment in favor of defendant Greifinger on the issue of qualified immunity is reversed and the case remanded for further proceedings consistent with this opinion.