**Marvin STEWART, Plaintiff**

v.

**Bob TAFT, et. al., Defendants**

**No. 3:02–CV–7057.**

United States District Court,
N.D. Ohio,
Western Division.

Oct. 8, 2002.

---

Marvin Stewart, Lima, OH, pro se.

Kelley A. Sweeney, Office of Attorney General, State of Ohio, Corrections Litigation Section, Cleveland, OH, for Defendants.

## ORDER

CARR, District Judge.

Plaintiff *pro se* Marvin Stewart brings this case under 42 U.S.C. § 1983 against Ohio Governor Bob Taft, Ohio Department of Rehabilitation and Correction ("ODRC") Director Reginald Wilkinson, ODRC Medical Director Dr. Bruce Martin, ODRC Associate Medical Director Dr. Lawrence Mendel, Allen Correctional Institution ("ACI") Doctor Ashwin Amin, ACI Health Care Administer Nurse Christine Barkimer, ACI Chronic Care Nurse Nancy Hefner, and "John/Jane Does × 1000." This court has jurisdiction pursuant to 28 U.S.C. § 1331. Currently pending is defendants' motion to dismiss, which is being treated as a motion for summary judgment because both parties rely on evidence outside the record. For the reasons given below, defendants' motion for summary judgment shall be granted.

## BACKGROUND

Marvin Stewart is an inmate at ACI, serving a term of fifteen years to life for a 1993 murder conviction. He began his incarceration at the Lorain Correctional Institution. He was transferred to ACI in 1999.

On March 29, 2001, sixty-three ACI inmates tested positive for the latent form of tuberculosis ("TB") in an institution-wide purified protein derivative ("ppd") test.[1]

---

1. TB is a communicable and potentially deadly disease that affects the lungs. It is spread through the air when a person with TB coughs or sneezes. TB exists in both latent and active stages. Persons with latent TB are infected with the bacterium that causes TB but have no obvious symptoms and are not

After all 2,147 ACI inmates were tested, approximately eighty to ninety inmates tested positive for latent TB—about four percent of the ACI inmate population. The ODRC has a goal of 0% infection rate, but a less than 1% infection rate will be tolerated.

In April, 2001, Ramon Perez, the ODRC's Infectious Disease Coordinator, and Jimmy Keller, a representative of the Center for Disease Control ("CDC") and the Ohio Department of Health, investigated the results of the positive ppd tests at ACI. Following the recommendations of the CDC Morbidity and Mortality Weekly Report ("MMWR"), Perez and Keller devised a treatment and prevention plan for the ACI inmates. Each inmate with latent TB received 900 milligrams of Isoniazid ("INH") twice a week for six months. Or, if the inmate preferred, he could take one pill, or 300 mg, of INH daily for six months. The inmates who did not test positive for TB were given ppd tests every three months. A less than 1% infection rate was accomplished in November, 2001. A 0% infection rate was accomplished by May, 2002.

Stewart tested positive for TB during the March 29, 2001, institution-wide test. On April 4, 2001, ACI prescribed Stewart 900 milligrams of INH and fifty milligrams of vitamin B6 every Tuesday and Friday for six months. On April 9, 2001, Stewart altered the regimen by taking 300 milligrams of INH daily for six months.

After testing positive for TB, Stewart complained that the combination of the prison's conditions—namely, overcrowding—and the staff's incompetence exposed him to the TB virus. On or about May 15, 2001, plaintiff claims he filed an "Informal Complaint" with defendant Nurse Barkim-

er asserting that the prison medical staff failed to control, treat, and properly test for TB.

On May 16, 2001, Stewart filed a "Notification of Grievance" to the ACI Inspector of Institutional Services. Plaintiff claimed the ACI staff disregarded a known and obvious health risk, failed to follow ACI policies relating to TB control once they were aware of inmates becoming exposed, failed to properly prevent further spreading after confirmed cases of TB appeared, and contributed to purposeful overcrowding of the inmate population.

In the ACI's "Disposition of Grievance" notice to Stewart, the Inspector of Institutional Services responded, in part:

> Allen Correctional Institution upon the discovery of a Positive T/B test implemented and appropriately followed Departmental infectious disease policy. All Staff and inmates were provided a PPD test. Appropriate treatment was given as necessary. Prison population in and of itself does not cause tuberculosis. Population trends are on a Consistent decrease between July of 1999 and January of this year there has been a 15% decrease in the population at ACI resulting in a 23.5% decrease in the crowding at ACI.

Plaintiff appealed this decision to the Office of the Chief Inspector. On July 2, 2001, the Assistant Chief Inspector affirmed the decision of the Inspector, noting:

> The Ohio Department of Health was consulted including a person who was trained by the Center for Disease Control who also provided advice and approved the action plan that was used. They continue to work with the depart-

---

ordinarily contagious. Persons with active TB have symptoms and are contagious. A prisoner with latent TB can be given Isoniazid, a drug which greatly reduces the risk that

he or she will develop active TB. Generally, however, a latent TB infection cannot be eliminated altogether. *See Williams v. Greifinger,* 97 F.3d 699, 701 (2d. Cir.1996).

ment. A second follow-up test will be provided in the second week of July. In light of these facts it does not appear that the institution has been indifferent to your medical needs.

On January 30, 2002, plaintiff filed this § 1983 action. Plaintiff alleges he has been subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

First, plaintiff claims that because of unconstitutional overcrowding in the prison, he was exposed to TB. This overcrowding, according to plaintiff, establishes a dangerous condition of confinement.

Second, plaintiff claims that the ACI staff failed to control, treat, and properly test for TB. Plaintiff alleges that ACI officials did not inform inmates there were active TB cases within ACI, and they failed to isolate any inmates with active TB. This delay in responding to a TB outbreak, according to plaintiff, caused Stewart's needless exposure to the disease.

Third, plaintiff claims his constitutional rights were violated by the inadequate medical treatment he received after he tested positive for TB.

Defendants move this court for summary judgment on all of plaintiff's claims.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden

then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

### I. Liability of Defendants Taft, Wilkinson, Martin, and Mendel

██ Defendants Taft, Wilkinson, Martin, and Mendel move this court for

summary judgment claiming they did not directly participate in any alleged deprivation of constitutional rights. Thus, they cannot be held liable.

Plaintiff claims that defendants Taft, Wilkinson, Martin, and Mendel were aware of the alleged unconstitutional overcrowding at ACI. This awareness, according to plaintiff, coupled with these defendants' failure to take the proper measures to prevent overcrowding, has caused ACI to become a breeding ground for infectious diseases. More specifically, defendant Taft has "personally failed to act and correct this problem ...." (Plaintiff Opposition Br. at ¶ 11) Defendant Wilkinson knew that "Ohio's prisons [were] severely overcrowded and he has taken no measure to correct this problem." (*Id.* at ¶ 17) Defendants Martin and Mendel have "directly or indirectly allowed the condistion [sic] at ACI to deteriorate substantially that caused the unconstitutional conditions at ACI." (*Id.* at ¶ 21) According to plaintiff, these defendants are therefore not liable under *respondeat superior*, but they have directly participated in depriving plaintiff of his constitutional rights.

The Supreme Court has clearly indicated that neither the doctrine of *respondeat superior* nor vicarious liability can form the basis of liability for a § 1983 claim. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984), the Sixth Circuit held that § 1983 liability of supervisory personnel must be based on more than the right to control employees. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or know-

ingly acquiesced in the unconstitutional conduct of the offending subordinate. *Id.* Thus, supervisory liability under § 1983 cannot attach where the allegation of liability is based on a mere failure to act. Instead, the liability must be based on active unconstitutional behavior. *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998).

Stewart has made no showing that Governor Taft, ODRC Director Wilkinson, ODRC Dr. Martin, or ODRC Dr. Mendel have directly participated in or authorized any of the prison's decisions that led to plaintiff's allegations of cruel and unusual punishment. Plaintiff has simply alleged that these individuals are generally responsible for the conditions within the prison system and ACI. Because there is no evidence that any of these defendants were personally involved in the delay of TB testing at ACI or Stewart's subsequent medical care, they will be dismissed from any § 1983 liability. Plaintiff's argument that his allegations against these defendants are not based on *respondeat superior* is not persuasive. *See Salehpour*, 159, F.3d at 206 ("The fact that Plaintiff did not couch his claim in [*respondeat superior*] terms does not change the substance of the allegation (these two Defendants in their official 'supervisory' capacity failed to prevent the alleged constitutional violations.")

## II. Cruel and Unusual Punishment

Defendants argue that plaintiff's exposure to TB does not rise to a level constituting a violation of the Eighth Amendment.

It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The scope of protection afforded to in-

mates under the Eighth Amendment is limited to ensuring that the state provides its inmates with adequate food, clothing, shelter, sanitation, medical care, and a reasonably safe environment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling,* 509 U.S. at 35, 113 S.Ct. 2475.

To survive a motion for summary judgment, an Eighth Amendment claim must satisfy a two-prong test. The first prong is an objective test asking whether the deprivation suffered by the plaintiff was sufficiently serious to rise to the level of a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The second prong is a subjective test in which the plaintiff must demonstrate that prison officials acted at least with "deliberate indifference" toward his or her needs. *Id.* at 298–99, 111 S.Ct. 2321.

Under the objective prong, an inmate must show he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. A prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Id.* (citations omitted). This test requires a court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling,* 509 U.S. at 36, 113 S.Ct. 2475.

Under the subjective prong, an inmate must show that prison officials acted with a "sufficiently culpable state of mind" which is " 'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. The standard for determining whether prison officials were deliberately indifferent is that of "recklessness as used in the criminal law." *Id.* at 839, 114 S.Ct. 1970. Prison officials can be considered "deliberately indifferent" only

if they actually know that an inmate faces a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it. *Id.* at 837, 114 S.Ct. 1970. The Supreme Court expressly rejected the idea that prison officials could be held liable based on a risk of harm of which they should have known. *Id.* Rather, to prove "deliberate indifference," the inmate must demonstrate not only that prison officials had actual knowledge of the facts from which one could infer a serious risk, but also that they drew that inference. *Id.*

Whether a prison official had the requisite knowledge of a substantial risk is, however, a question of fact, and a factfinder may conclude that a prison official knew of a substantial risk from the fact that the risk was obvious. *Id.* at 842, 114 S.Ct. 1970. A prison official may not escape liability if the evidence showed that he or she merely refused to verify underlying facts that he or she strongly suspected to be true, or declined to confirm inferences of risk that he or she strongly suspected to exist. *Id.* at 843 n. 8, 114 S.Ct. 1970. On the other hand, prison officials who actually knew of a substantial risk to inmate health or safety, may be found free from liability if they respond reasonably to the risk, even if the harm ultimately was not averted. *Id.* at 844, 114 S.Ct. 1970.

### A. Failure to Prevent Harm

■ Plaintiff claims defendants Amin, Barkimer, and Hefner were aware that there were active cases of TB within ACI and they were deliberately indifferent to the health and safety of ACI inmates by not preventing further infection. Plaintiff claims inmates with active TB roamed among the inmate population and not until a staff member became positive with TB was an institution-wide test was initiated.

In support of his claim that ACI officials knew of active TB cases, Stewart has pro-

vided copies of complaints and appeals to ACI staff and inspectors by other ACI inmates prior to the March 29, 2001, institution-wide test. These complaints, one dated as early as January 29, 2001, repeatedly state the prisoners' concerns about rumors of an active case of TB. Each complaint asks for a TB test and information on any active cases.

In the official responses to these complaints, Nurse Barkimer, on February 1, 2001, noted: "There is no necessity for additional testing (TB). Inmate and staff are tested yearly." (Plaintiff's Opposition Br.). In a "Disposition of Grievance" notice dated February 6, 2001, the Inspector of Institutional Services stated:

> Grievants complaint is based on rumors and not on factual information. Every staff and inmate are provided annually a PPD skin test as required by departmental policy. Departmental policy provides specific procedures and protocols that must be followed as it pertains to infectious diseases. Grievants risk of exposure to infectious disease is not greater than in his past incarcerations and is more likely to be exposed from family and friend during visits than in the institution where annual testing is conducted.

Complaint, p. 24.

Plaintiff claims the delay in responding to a TB outbreak caused his needless exposure to the disease. More specifically, plaintiff complains:

> The exposure to the "TB" virus, and prison officials delay to do any type of proper testing, treating and prevention is not part of Plaintiff's conviction and sentence, and this does impose atypical singificant [sic] hardship in Plaintiff's condition of confinement tantamount to

the "wanton infliction of pain and suffering."

Complaint, p. 14 at ¶ 49.

In their motion for summary judgment, defendants argue that plaintiff has failed to present any evidence with regard to the subjective component of his Eighth Amendment claim. They argue plaintiff must show that defendants knowingly exposed him to TB and failed to take reasonable steps to prevent injury to him. Defendants claim that once ACI staff became aware that an inmate had TB, ACI took immediate, reasonable steps to protect and treat all ACI inmates.

The evidence defendants use to support their motion includes the Inspector's "Disposition of Grievance," addressed to Stewart, that stated once ACI staff discovered TB, they followed departmental infectious disease policy. Defendants' other evidence is the action plan created with the advice of the CDC and Ohio Department of Heath. The affidavits of Perez and Nurse Barkimer describe the treatment and preventative measures initiated under the plan after the discovery of TB. This evidence, according to the defendants, demonstrates that defendants could not have been deliberately indifferent.

Defendants' main evidence, however, documents the steps ACI officials took after the outbreak of TB. Defendants offer no evidence, other than the fact they followed the annual TB testing policy, to prevent the transmission of TB among ACI inmates before March 29, 2001. Thus, it is possibly true that if the ACI staff had acted sooner, they may have prevented plaintiff from being exposed to TB.

However, plaintiff has presented no evidence that the ACI staff actually knew ACI inmates were at risk of exposure to TB and they consciously disregarded that known risk. The copies of complaints and

grievances submitted by plaintiff do not demonstrate there was an active TB case in the prison population. The copies demonstrate inmates were concerned about a rumor of an active case of TB. This does not prove ACI staff had actual knowledge of a potential TB outbreak or that they should have verified the rumor because they strongly suspected it to be true. Furthermore, the copies do not show that even if ACI staff had knowledge of a potential health hazard to inmates, they consciously disregarded the health risk by not reasonably responding. As the Supreme Court concluded in *Farmer*, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." 511 U.S. at 838, 114 S.Ct. 1970.

### B.  Conditions of Confinement

█ Plaintiff alleges that ACI is unconstitutionally overcrowded. According to plaintiff, due to state budget cuts, ACI had to close one housing unit. This has resulted in severe overcrowding. For example, Stewart claims that occasionally four inmates are housed in cells designed for one or two inmates. This overcrowding, plaintiff alleges, manifests deliberate indifference to the health and safety of the inmates, which led to the spread of infectious diseases and his positive test for TB.

Overcrowding in a prison is not itself a violation of the Constitution. The Supreme Court has stated that "the Constitution does not mandate comfortable prisons ... these considerations properly are weighed by the legislature and prison administration rather than a court." *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (finding double celling in Ohio prisons was not a constitutional violation and the federal courts have no authority to determine whether double

celling was the best response to the increase in Ohio's prison population).

Plaintiff also alleges, however, that the overcrowding caused his exposure to TB. Defendants argue that prison population itself does not cause TB, and that ACI's population has been decreasing. In response, plaintiff has produced no evidence that ACI is overcrowded and that if it were not overcrowded, then he would not have contracted TB. Plaintiff's claim rests on his own mere allegations that overcrowding at ACI is a condition posing a substantial risk of serious harm and that the defendants acted with "deliberated indifference" to his health or safety by consciously disregarding the alleged overcrowding. Allegations without evidence cannot carry a case past summary judgment; especially where, as here, defendants have rebutted plaintiff's claim of deliberate indifference to TB infection.

### C.  Inadequate Medical Care

█ Plaintiff claims his treatment regimen resulted in a denial of adequate medical care. Plaintiff alleges he was not informed that taking INH could cause serious side effects, and he claims that he suffers from these side effects, including Hepatitis C. He also complains that as a result of his exposure to the TB virus, he must seek a TB tests at least once a year after his release to ensure that the TB virus has not become active. Finally, plaintiff claims that he was not given the proper prescribed dosage of INH. He was instructed to take INH twice a week for six months. Stewart claims the CDC recommends nine months of INH treatment.

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court extended the reach of the Eighth Amendment to create a constitutional obligation on the part of the government to provide prisoners with adequate

medical care. Under the subjective component of the Eighth Amendment claim, however, mere negligence in diagnosing or treating a complaint or condition does not state a valid claim of medical mistreatment under the Constitution. *Id.* at 106, 97 S.Ct. 285. An "inadvertent failure to provide adequate medical care" cannot be said to constitute deliberate indifference. *Id.* at 106, 97 S.Ct. 285

As the Sixth Circuit has explained, when the dispute concerns the adequacy of a prisoner's medical treatment, a federal court should not second guess medical judgments unless the treatment is so "woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (6th Cir.1976).

Here, defendants satisfy their burden of production for summary judgment on the issue of whether plaintiff received adequate medical care. Defendants followed the CDC's recommendations for the treatment of TB. The CDC's MMWR states that nine months of INH therapy is the "preferred treatment" but a six month regimen "also provides substantial protection." (Defendant's Reply Br. at Ex. A–1) The report states:

> From a societal perspective, treatment for 6 mo rather than 9 mo may provide a more cost-effective outcome. Thus, based on individual situations, health departments or other providers may prefer to concentrate efforts in ensuring the implementation of a 6–mo rather than a 9–mo course of isoniazid.

*Id.*

By following this recommendation, defendants have proved that any alleged inadequacy of plaintiff's treatment was not sufficiently serious to rise to the level of an Eighth Amendment claim and that defendants have not acted with a culpable state of mind.

The only claims plaintiff could have against ACI would be based in negligence—either negligent failure to warn of side effects or negligent treatment if his age and condition required a nine month regimen of INH. The Supreme Court concluded, however, that:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle,* 429 U.S. at 106, 97 S.Ct. 285.

Therefore, plaintiff's difference of opinion regarding his treatment regimen is insufficient to state a claim under the Eighth Amendment.

Defendants offer proof that they properly treated Stewart to prevent him from developing active TB. Plaintiff fails to set forth specific facts sufficient to show that a reasonable jury could return a verdict in his favor. Defendants' motion for summary judgment shall be granted on this claim.

## CONCLUSION

It is, therefore,

**ORDERED THAT**

Defendants' motion for summary judgment be, and hereby is, granted.

**So ordered.**