23-7377-cv

# United States Court of Appeals
# For the Second Circuit

August Term 2024
Argued: October 28, 2024
Decided: October 6, 2025

No. 23-7377-cv

VERONICA-MAY CLARK,

*Plaintiff-Appellee,*

*v.*

GERALD VALLETTA, RICHARD BUSH,
AND BARBARA KIMBLE-GOODMAN,

*Defendants-Appellants.*[*]

Appeal from the United States District Court
for the District of Connecticut
No. 19-cv-575
Vanessa Lynne Bryant, *Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Before: SULLIVAN, PARK, and ROBINSON, *Circuit Judge*s.

Plaintiff Veronica-May Clark is a transgender inmate in the Connecticut prison system claiming that corrections officials violated the Eighth Amendment by failing to provide certain treatments for gender dysphoria, including stronger hormone therapy and a vaginoplasty. Defendants moved for summary judgment on qualified-immunity grounds. The district court (Bryant, *J.*) denied the motion, finding that Defendants violated a clearly established right "to be free from deliberate indifference to serious medical needs." We conclude that Defendants are entitled to qualified immunity. Inmates have no clearly established right to be treated by gender-dysphoria specialists or to receive specific treatments for gender dysphoria. And reasonable officers could disagree on the legality of Defendants' efforts to treat Clark, including with talk therapy and antidepressants. The order of the district court is **REVERSED**, and the case is **REMANDED** with instructions to grant Defendants' motion for summary judgment on qualified-immunity grounds.

Judge Robinson concurs in part and dissents in part in a separate opinion.

———

JAMES M. BELFORTI, Janelle R. Medeiros, Terrence M. O'Neill, Assistant Attorneys General, *for* William Tong, Attorney General of Connecticut, Hartford, CT, *for Defendants-Appellants*.

ELANA BILDNER, Dan Barrett, Sapana Anand, American Civil Liberties Union Foundation of Connecticut, Hartford, CT; Daniel S. Noble, Krieger Lewin LLP, New York, NY; Evan I. Cohen, Matthew B. Danzer, Kelsey A.

2

Powderly, Finn Dixon & Herling LLP, Stamford, CT, *for Plaintiff-Appellee*.

————

PARK, *Circuit Judge*:

Plaintiff Veronica-May Clark is a transgender inmate in the Connecticut prison system claiming that corrections officials violated the Eighth Amendment by failing to provide certain treatments for gender dysphoria, including stronger hormone therapy and a vaginoplasty. Defendants moved for summary judgment on qualified-immunity grounds. The district court denied the motion, finding that Defendants violated a clearly established right "to be free from deliberate indifference to serious medical needs." We conclude that Defendants are entitled to qualified immunity. Inmates have no clearly established right to be treated by gender-dysphoria specialists or to receive specific treatments for gender dysphoria. And reasonable officers could disagree on the legality of Defendants' efforts to treat Clark, including with talk therapy and antidepressants. The order of the district court is reversed, and the case is remanded with instructions to grant Defendants' motion for summary judgment on qualified-immunity grounds.

## I. BACKGROUND

A.  Factual Background

Clark, then known as Nicholas Clark,[1] was convicted of murder, assault, burglary with a deadly weapon, and violation of a

---

[1] Clark's name-was changed to "Veronica-May Clark" by order of Connecticut Probate Court in December 2021. *See* Dist. Ct. Dkt. 3 at 105.

3

protective order in 2009. As part of that offense, Clark broke into his ex-wife's house, severely disfigured her with a pipe, and beat her new partner to death. Clark is serving a 75-year sentence without the possibility of parole in the Connecticut prison system.

In April 2016—more than seven years into that sentence—prison clinicians learned that Clark identified as a transgender woman. A health-care provider at Cheshire Correctional Institution diagnosed Clark with gender dysphoria the next month.[2] In July 2016, Clark attempted self-castration with a nail clipper.

Shortly afterward, prison officials transferred Clark to Connecticut's Garner Correctional Institution—a high-security prison for adult men with significant mental-health issues—as Clark recovered from the self-inflicted wound. As relevant here, Clark was placed under the care of three Garner officials: Defendants Dr. Gerald Valletta, Barbara Kimble-Goodman, and Richard Bush.

1.    *Defendants' Care*

Dr. Gerald Valletta, Garner's principal physician, cared for Clark from August 2016 until March 2020. Valletta is a medical doctor, not a mental-health provider, who lacked expertise in treating gender dysphoria. Valletta treated Clark's injury with wound care, antibiotics, and pain medication until September 2016, when Clark

---

[2] The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* defines "gender dysphoria" as "a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 512 (5th rev. ed. 2022).

4

began refusing medications. Valletta's general care also included medical treatment for a hernia, abdominal pain, jaw pain, an alleged sexual assault, a wrist injury, a chronic cough, and hunger strikes, along with routine exams and vaccinations.

At their first meeting on August 1, 2016, Clark asked Valletta for various gender-dysphoria treatments. Valletta soon referred Clark to an unnamed mental-health Advanced Practice Registered Nurse. But unsatisfied with that treatment, Clark filed a grievance on August 24, 2016, complaining of continual denial of access, "going on five months now, to transition-related healthcare." Joint App'x at 33. In September and October of that year, Clark submitted requests to Valletta for hormone therapy, laser hair removal, and a vaginoplasty.

Valletta denied Clark's requests based on his understanding that Connecticut prison policy allowed for the continuation, but not the initiation, of hormone therapy for inmates. Valletta thus believed that he lacked the authority to refer Clark to an outside endocrinologist for such treatment. Clark further alleges that Valletta never looked into surgical intervention.

But Clark did receive mental-health treatment and lifestyle accommodations at Garner. The male prison, for example, stocked female commissary items like bras to purchase. Clark also met with Barbara Kimble-Goodman, a psychiatric Advanced Practice Registered Nurse, seven times between November 2016 and June 2018. Kimble-Goodman treated Clark's dysphoric mood with psychotherapy and psychiatric medications when Clark accepted them. Like Valletta, Kimble-Goodman lacked specialized training for treating transgender inmates. Her authority was limited to providing

5

mental-health care, and she could not herself procure hormone therapy or surgical interventions for inmates.

During meetings on November 7, 2016, February 2, 2017, and June 6, 2017, Clark complained to Kimble-Goodman of a dysphoric mood. Clark also reported the denial of hormone therapy because of the prison's continuation-only policy. Kimble-Goodman noted that Clark was "stressed" and felt "poison[ed]" by having male genitalia. Joint App'x at 95. She offered Clark antidepressant medication to help stabilize these moods, but Clark refused to accept a prescription until July 2017.

In July 2017, Valletta learned of a change in prison policy and referred Clark to receive further evaluation for gender dysphoria and to see an endocrinologist for potential hormone therapy. On September 20, 2017, Clark met with an endocrinologist from the University of Connecticut ("UConn"). That specialist prescribed hormones, requested bloodwork, and proposed that specialists reevaluate Clark in three months. Valletta's role in that care was to follow the endocrinologist's dosing recommendations, order lab work when requested by the specialists, and resubmit approvals for follow-up visits.

Hormone therapy and antidepressants helped Clark's mood. On November 28, 2017, Clark reported "improved sleep, appetite, and motivation," as well as higher self-esteem, slowed male-pattern baldness, and a reduced sex drive. Special App'x at 15. Clark's mood was "really good, best ever." *Id.* By April 2018, Clark reported feeling "better than ever, best in my life." *Id.*

But Clark began refusing antidepressants in April 2018 because they caused stomach upset during a hunger strike. Later that month, Clark submitted a grievance due to not receiving estradiol—a female hormone—for four days because the medication had expired. Clark complained that this was the fourth or fifth such incident. That fall, Clark alleged another four-day lapse in hormone treatment because of the prison's failure to fill the prescription.

In May 2018, Clark complained to Valletta about the transition treatment, again requesting a vaginoplasty and threatening self-castration. Valletta requested additional lab work and said that he would "look into bottom surgery as an option." Special App'x at 16. On June 28, 2018, Clark met with Kimble-Goodman, who described Clark as being "[s]tressed out about the hormones and meds," shaving often, and feeling "depressed [when] in the cell, [and] happy out of the cell." *Id.* Clark also told Kimble-Goodman about writing to Planned Parenthood for help with the hormone treatment.

In response to Clark's concerns that the hormone therapy was not being administered properly, Valletta ordered lab work to monitor the therapy eleven times from September 29, 2017, to February 4, 2020. The tests from October 2017 to September 2019 showed Clark's testosterone levels remaining normal for an adult man—and even increasing—despite the hormone treatment. In July 2018, Clark reported feeling "traumatized" by persisting erections and advancing male pattern baldness—issues Clark attributed to persistently high testosterone levels. Special App'x at 17.

Valletta arranged sporadic check-ins for Clark's hormone therapy. After an initial September 20, 2017 appointment, Clark was

7

next seen by UConn Endocrinology on August 13, 2019, although the endocrinologist had recommended a follow-up in three months. After that, Clark saw the endocrinologist again on October 8, 2019, and February 11, 2020, and the endocrinologist increased Clark's dosage after both visits.

Throughout this time, Clark repeatedly demanded surgical intervention. On July 18, 2018, Clark filed a fourth inmate request form demanding such care—this time seeking a vaginoplasty, facial reconstruction, excision of Clark's Adam's apple, and hair restoration. Clark wrote: "I do not know how to communicate how much pain I'm in." Special App'x at 18. Valletta met with Clark about this request on July 24, 2018, and submitted a new order for onsite mental-health care to replace Kimble-Goodman, who had left Garner.

During this period, Clark also met twice with Richard Bush, a licensed clinical social worker to whom the prison directed some of Clark's grievance requests. Like Valletta and Kimble-Goodman, Bush had no special training on treating transgender inmates. His role as a social worker was limited to providing talk therapy and assessing and referring Clark for additional care as needed. He knew that Clark was being seen by an advanced psychiatric nurse and the UConn endocrinology department for gender-dysphoria treatment. He had no authority to order surgical care for patients. At their first meeting on March 8, 2019, Clark complained to Bush about inaction on Clark's inmate grievances. Bush responded that Clark had no pending grievances and provided talk therapy.

Bush saw Clark for the second—and last—time on September 12, 2019. Clark was upset that nothing seemed to be happening with

8

respect to the transition and requested a referral to a new mental-health provider.  Bush listened and provided support, but did not arrange for new treatment.  A different prison official responded to Clark's subsequent requests for sex-reassignment surgery and improved hormone therapy in October 2019, assuring Clark that "per our discussion you were notified you are on MDSC list for further eval."  Special App'x at 21.

The Department of Corrections returned Clark to Cheshire Correctional Institution in March 2020, after which Defendants were no longer responsible for Clark's care.

2.    *Standards of Care*

According to the American Psychiatric Association's *Diagnostics and Statistics Manual*, gender dysphoria entails "increased rates of depression, suicidality, and other mental disorder co-occurrence."  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 519 (5th rev. ed. 2022).  It is undisputed that Clark suffered from severe gender dysphoria.  But how to treat that disorder is not settled in the scientific and medical community.

Clark's expert, Dr. George R. Brown, is a professor of psychiatry at East Tennessee State University's College of Medicine.  He has served since 1990 on the World Professional Association for Transgender Health's (WPATH) Committee to Revise the *Standards of Care* and co-authored recent versions of the *Standards*.  He considers the *Standards* "authoritative for the evaluation and treatment" of gender dysphoria.  Dist. Ct. Dkt. 133, Ex. 1, at 31.  Those guidelines "can be modified based on individualized patient circumstances and their health care professional's clinical judgment."  *Id.* at 31-32.  He

9

also believes that "[w]ith appropriate treatment, individuals with a [gender-dysphoria] diagnosis can be fully cured of all symptoms." *Id.* at 32.

Brown opined that gender-dysphoria treatment "involves both psychological and medical aspects." *Id.* In his view, common treatment methods include "hormone therapy, social role transition, and surgical intervention." *Id.* "What is required in any individual case, however, may vary." *Id.* Other treatments involve "electrolysis, voice therapy, breast augmentation, [and] facial reconstruction." *Id.*

In Brown's opinion, the Department of Corrections had "provided inadequate, substandard medical, psychiatric, and surgical care" for Clark's severe dysphoria. *Id.* at 51. First, Brown found Clark's mental-health care lacking because it was not "specialized psychological treatment" for gender dysphoria. *Id.* Second, Brown remarked that Clark "received overly conservative, inadequate hormonal care" for gender dysphoria. *Id.* at 50. Clark's "assessments were far too infrequent, resulting in an inordinate amount of time in an undertreated condition at very small doses of estrogen that were largely ineffective for the first two years or more." *Id.* Third, Brown believed that Clark "can't be treated adequately without access to gender confirmation surgery." Dist. Ct. Dkt. 133, Ex. 3, at 247. Although Brown's clinical practice is to reserve surgery as "a last resort," he opined that Clark was in the "subset" of transgender people requiring surgical intervention. *Id.*

Defendants' expert, Dr. Stephen Levine, pointed to "considerable growing disagreement within the medical and scientific communities on how to best treat people with gender

10

dysphoria." Dist. Ct. Dkt. 128, Ex. E, at 3. Levine is a professor of psychiatry at Case Western University's School of Medicine and was once chair of the group responsible for the fifth edition of the WPATH's *Standards of Care*. But he opined that WPATH's recommendations are now dubious because WPATH "has transformed into an advocacy organization" that "fail[s] to perform appropriate scientific study methods." *Id.* at 2.

According to Levine, gender-dysphoria treatment "can come in various forms," including lifestyle accommodations and psychotherapy. *Id.* at 3. More "advanced form[s] of affirmative treatment" involve hormone therapy and surgical intervention. But "[t]here remains a very high risk that people with gender dysphoria who have had genital surgery will still have severe psychiatric problems, including but not limited to, continuing gender dysphoria, depression, substance abuse, anxiety, suicide attempts, and completed suicides." *Id.* at 4.

Levine described Clark's treatment as "far less than ideal." Dist. Ct. Dkt. 133, Ex. 4, at 4. But based on interviews and medical records, he found that Clark suffered from "poor judgment, unrealistic expectations, and exaggerated psychological pain." Dist. Ct. Dkt. 128, Ex. E, at 9. Levine further diagnosed Clark with "Alcohol and Substance Abuse Disorder," "Mixed Character Disorder with paranoid, grandiose, histrionic manipulation, narcissistic entitlement and dependent features," and "[p]ossible traumatic stress disorder due to being forced into sexual availability in prison." *Id.* at 9-10.

As Levine explained, Clark had a "serious form of character pathology" and was "highly unrealistic." *Id.* at 11-12. For example,

11

Clark hoped to be extradited to the United Kingdom, where doctors could provide a functioning uterus. *See id.* at 12-13. "Clark's unrealistic outlook and misconceptions about genital surgery" concerned Levine, "because in order for a person with gender dysphoria to be a good candidate for genital surgery, they must understand the actual implications of the surgery." *Id.* at 13. Levine thus found Clark unfit for sex-reassignment surgery. *See id.* at 14.

B. <u>Procedural History</u>

In April 2019, Clark sued Defendants Valletta, Kimble-Goodman, and Bush. The amended complaint alleged deliberate indifference in violation of the Eighth Amendment and intentional infliction of emotional distress for failure to "provide adequate and necessary medical treatment" for gender dysphoria. Joint App'x at 39. Clark also sought injunctive relief against the Commissioner of Connecticut's Department of Corrections, which is not at issue in this interlocutory appeal.

Defendants moved for summary judgment on qualified-immunity grounds and the merits of Clark's claims. As to qualified immunity, they argued that there was no violation of Clark's Eighth Amendment rights. Defendants also argued that there is no clearly established right to particular gender-dysphoria treatments and that other reasonable officials also would have denied Clark's requests. Clark cross-moved for summary judgment on all claims.

The district court partially granted Clark's motion on the deliberate-indifference claim. It first found that prison officials had deprived Clark of "adequate care" through mental-health treatment from unqualified providers, delayed and insufficient hormone

12

treatment, and denial of a vaginoplasty. Special App'x at 46. The court then inferred that Defendants acted with the requisite subjective indifference to Clark's needs because it was "obvious" that the failure to refer Clark to a qualified provider would perpetuate "acute anguish." *Id.* at 56-58.

The district court concluded that Defendants were not entitled to qualified immunity. Although it noted the Supreme Court's instruction that clearly established rights "cannot be overly general so as to make a rule of virtually unqualified liability simply by alleging violation of extreme abstract rights," it nonetheless found that Defendants had violated the clearly established "right to be free from deliberate indifference to serious medical needs." *Id.* at 60-61 (quotation marks omitted). The district court reasoned that Defendants "failed to facilitate any informed care from a provider qualified to treat" Clark's condition. *Id.* at 64. In its view, "no reasonable official would have believed it was lawful to fail to provide informed care" to Clark. *Id.* at 64-65.

Defendants timely appealed the denial of qualified immunity.

## II. DISCUSSION

Defendants argue that they are entitled to qualified immunity because (1) Clark had no clearly established right to specific gender-dysphoria treatments and (2) their actions were objectively reasonable. We agree.

A.   Legal Standards

"We review a district court's denial of a motion for summary judgment sounding in qualified immunity *de novo*" and "draw all

13

factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quotation marks omitted).[3]

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).[4] Even if an officer violated a plaintiff's clearly established rights, he "will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). These protections "balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. Const., amend. VIII. In *Estelle v. Gamble*,

---

[3] "This Court has jurisdiction to review an interlocutory order denying qualified immunity so long as defendants pursue the appeal on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (cleaned up).

[4] "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 563 U.S. at 735. We proceed under the clearly-established-law prong before "expending scarce judicial resources to resolve difficult and novel questions." *Id.* (cleaned up).

the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment[,] . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." 429 U.S. 97, 104-05 (1976) (cleaned up). But objective indifference is not enough to violate the Eighth Amendment. A "prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

B.    Clearly Established Law

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (cleaned up).

"The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality, instead emphasizing that clearly established law must be particularized to the facts of the case." *Francis*, 942 F.3d at 146 (cleaned up). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quotation marks omitted). "The rule must be settled law, which means it is dictated by

15

controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up).

### 1. *Clearly Established Rights in Deliberate-Indifference Cases*

In addition to being firmly settled, the clearly established rights at issue must be sufficiently particularized to an inmate's individual circumstances. Specificity is necessary because qualified immunity focuses "on whether the officer had fair notice that her conduct was unlawful." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (cleaned up). In *Taylor*, the Supreme Court held that prison officials were immune from deliberate-indifference claims for "failing to prevent" a detainee's suicide based on an allegedly inadequate screening protocol. 575 U.S. at 823. The Court found "no violation of clearly established law" because no Supreme Court decision "establishes a right to the proper implementation of adequate suicide prevention protocols," or "even discusses" such protocols. *Id.* at 826. And circuit precedent concluding that prison officials can be "recklessly indifferent" to suicidality was not specific enough to put the officials in *Taylor* on notice "that they were overseeing a system that violated the Constitution." *Id.* at 827. So even in deliberate-indifference cases, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 825 (cleaned up).

The district court here erred by conducting its qualified-immunity analysis at too high a level of generality. It defined the relevant right as "the right to be free from deliberate indifference to

16

serious medical needs."  Special App'x at 61.[5]  But such a right "is far too general a proposition to control this case."  *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015).  "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from" a given constitutional injury.  *Id.*

Clark argues that our precedents clearly establish a broad right to be free from deliberate indifference.  That is incorrect.  In *LaBounty v. Coughlin*, 137 F.3d 68 (2d Cir. 1998), on which the district court relied, we denied prison officials qualified immunity from claims brought by prisoners exposed to crumbling asbestos.  But that case involved *total inaction* in the face of an obvious hazard—it did not address any question of discretion in medical care.   And our statement in *LaBounty* recognizing "the right to be free from deliberate indifference to serious medical needs, established in *Estelle v. Gamble*," *id.* at 74 (citations omitted), must be read consistent with the Supreme Court's warnings against framing rights too broadly.

The other circuit precedents on which Clark relies are similarly inapt.  The district court described *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994), as establishing that "a practitioner who merely provides the same course of treatment when it clearly does not alleviate an inmate's suffering—as evidenced by the inmate's numerous complaints—acts with deliberate indifference."  Special App'x at 64.  But *Hathaway*, like *LaBounty*, cannot be read to create a broad right against deliberate indifference divorced from its factual

---

[5] Clark asks us to recognize an even broader constitutional right "to be free of chronic and substantial pain that is important and worthy of comment or treatment."  Appellee's Br. at 33 (quotation marks omitted).

17

context.  The inmate in that case "complained of hip pain on nearly fifty occasions," but the doctor, who knew that the inmate's hip pins were broken, did not tell the inmate about them for two years and instead offered "largely ineffective" painkillers.  *Hathaway*, 37 F.3d at 68.  We held only that a "jury could infer deliberate indifference" from the doctor's failure to arrange any further treatment despite knowing about the broken pins.  *Id.* at 68-69.

Here, Defendants provided Clark with psychotherapy, antidepressants, lifestyle accommodations, and hormone therapy— all of which are reasonable treatments for gender dysphoria.  Indeed, these treatments helped Clark feel "really good, [the] best ever," at least for a while.  Joint App'x at 122.  Clark's course of treatment is unlike the total inaction in *LaBounty* or the deception in *Hathaway*, and those cases could not have put reasonable officers on notice that Defendants' efforts to provide care to Clark violated the Constitution.

Finally, Clark seizes on language from our decision in *Collymore v. Myers*, 74 F.4th 22, 30 (2d Cir. 2023), to argue there is "a right to be free of chronic and substantial pain that is important and worthy of comment or treatment."  Appellee's Br. at 44 (cleaned up).  But *Collymore* did not—and could not—clearly establish such a sweeping right.  We held only that a painful scalp infection was "a serious medical condition" under the objective prong of the Eighth Amendment deliberate-indifference standard.  74 F.4th at 30.[6]  We

---

[6] *Collymore* explicitly limited its holding to the objective component of the deliberate-indifference standard.  *See* 74 F.4th at 31 ("While it may be that the defendants did not act with 'deliberate indifference' or that some or all of the conduct can be classified as malpractice at worst, the district

18

rejected the assertion that the seriousness of a skin condition had to be determined "body-part by body-part." *Id.* But Defendants do not contest that Clark's gender dysphoria is a serious medical condition; they challenge the conclusion that their *treatment* of that condition clearly violated the Eighth Amendment. Nothing in *Collymore* suggests that Defendants were on notice that their years of treatment violated Clark's Eighth Amendment rights.

Other courts have rejected broad framings of rights to gender-dysphoria treatment. For example, the Seventh Circuit held in a similar case—*i.e.*, addressing qualified immunity from an inmate's Eighth Amendment claims based on the denial of sex-reassignment surgery after hormone treatment—that the "proper inquiry is whether then-existing caselaw clearly established a constitutional right to gender-dysphoria treatment beyond hormone therapy." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019). "When considering deliberate-indifference claims challenging the medical judgment of prison healthcare personnel, qualified-immunity analysis requires us to frame the legal question with reasonable specificity." *Id.*

The dissent contends that the majority takes an overly narrow, treatment-by-treatment approach in defining the constitutional question. *Post* at 23. But that argument rests on a mischaracterization of the record—namely, that Defendants completely failed to treat Clark's condition. It is true that when officials fail to do *anything* to address an inmate's serious medical needs, the constitutional concern

court did not pass on those issues and this Court will not consider them now.").

is not about the failure to provide a specific treatment.[7] *See infra* Section II.B.3. In contrast, "once medical care begins" and an inmate "challeng[es] the medical judgment of prison healthcare professionals who actually diagnose and treat an inmate's medical condition (as opposed to ignoring it), we *necessarily* evaluate those discrete treatment decisions." *Campbell*, 936 F.3d at 548. Here, as recounted above, there was a progression of care that included talk therapy, medication for depression, and later, hormone therapy. Qualified immunity thus applies unless Defendants were on notice that failing to include Clark's requested treatments in that course of care would amount to a constitutional violation.[8]

---

[7] Indeed, the out-of-circuit cases that the dissent cites to support its broad framing all involve obvious lapses in responding to a serious medical condition. *See Pfaller v. Amonette*, 55 F.4th 436, 453 (4th Cir. 2022) (denying qualified immunity where a doctor ignored his supervisor's directives to monitor an inmate's hepatitis for two and a half years); *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) (denying qualified immunity where a prison official "chose to do nothing" despite knowing an inmate was suicidal); *Russell v. Lumitap*, 31 F.4th 729, 742-43 (9th Cir. 2022) (denying qualified immunity where a doctor did not order hospitalization of an inmate exhibiting clear signs of a heart attack); *Murray v. DOC*, 29 F.4th 779, 783-84, 790-91 (6th Cir. 2022) (denying qualified immunity where a doctor failed to assess an inmate with deep-vein thrombosis after he presented with signs of a cerebral edema that resulted in permanent blindness). Here, in contrast, the record shows that Defendants' treatment regimen largely addressed the serious risks of harm attending Clark's gender dysphoria.

[8] Even adopting the dissent's overly general framing of the right at issue as the right to "an individualized assessment and . . . adequate care" for a serious medical condition, *post* at 24, our conclusion remains the same because Clark received both, *see infra* at 26-28.

In sum, Supreme Court precedent requires us "not to define clearly established law at a high level of generality" lest we subject defendants to liability without fair notice that their conduct is unlawful. *al-Kidd*, 563 U.S. at 742. The district court's overbroad framing excludes any reference to gender dysphoria or the specific treatments Clark demands for that condition. It also avoids the near-unanimous weight of authority holding that there is no right to an inmate's preferred gender-dysphoria treatments. Following the context-specific approach in *Taylor*, the proper inquiry here is whether there is a clearly established right to a specific course of gender-dysphoria treatment, including hormone therapy and sex-reassignment surgery.[9] The answer is no.

2.    *No Right to Specific Gender-Dysphoria Treatments*

Neither the Supreme Court nor this Court has recognized, much less clearly established, any constitutional right to specific gender-dysphoria treatments.

First, the Supreme Court has never addressed the medical care owed to transgender inmates under the Eighth Amendment. In *Farmer v. Brennan*, the Court recognized that prison officials' duty to protect prisoners from violence could support a failure-to-protect claim from a transgender inmate placed in the general population.

---

[9] Defendants argue that the inquiry should be confined to whether Clark had "a right to hormone therapy within a certain time frame and vaginoplasty surgery." Appellants' Br. at 2. But this framing is too narrow because it focuses on just two aspects of Clark's complaint, which also alleges a deprivation of other requested treatments, including facial-reconstruction surgery and hair removal.

21

511 U.S. at 833.  It then clarified the subjective prong of deliberate indifference and remanded without fashioning any rights specific to transgender prisoners, let alone specific treatment for gender dysphoria.

Second, this Court has not recognized any right to gender-dysphoria treatment or denied qualified immunity in similar cases. The only Second Circuit case to address similar issues is *Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000), in which a transgender detainee who had been taking hormones before imprisonment alleged that prison medical officials withheld estrogen in violation of prison policy and the Constitution.  We found no constitutional violation in withholding such treatment, even though Cuoco suffered visible symptoms of withdrawal and threatened suicide.  And we held that the defendants were entitled to qualified immunity. *Id.* at 109-11.  As to two mental-health providers, we concluded that it was "objectively reasonable" to "refus[e] to intervene in the medical treatment of another doctor's patient simply because the patient demanded it." *Id.* at 111.  *Cuoco* does not come close to establishing an inmate's right to specific treatments for gender dysphoria.

Third, most other circuits have rejected deliberate-indifference claims for denial of specific gender-dysphoria treatments.  The First Circuit has held that denial of sex-reassignment surgery did not violate the Eighth Amendment when other ameliorative measures were provided to an inmate. *See Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2014) (en banc).  The Fifth Circuit similarly rejected a claim for denial of sex-reassignment surgery because there "is no intentional or wanton deprivation of care if a genuine debate exists within the

22

medical community about the necessity or efficacy of that care." *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) (en banc). The Tenth Circuit also rejected deliberate-indifference claims from an inmate who—like Clark—received hormones and psychotherapy but wanted sex-reassignment surgery and stronger hormones. *See Lamb v. Norwood*, 899 F.3d 1159, 1162-63 (10th Cir. 2018) (holding that "prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants"); *see also Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1277 (11th Cir. 2020) ("[Defendants] chose a meaningful course of treatment to address [plaintiff's] gender-dysphoria symptoms— treatment that, while perhaps different from (and less than) what [plaintiff] preferred, is sufficient to clear the low deliberate-indifference bar."); *Reid v. Griffin*, 808 F.3d 1191, 1193 (8th Cir. 2015) ("[Plaintiff] does not suggest any actions that the defendants could have taken to prevent her from inflicting self harm other than providing estrogen-replacement therapy—treatment to which she is not entitled under the law.").

The Seventh Circuit has similarly afforded qualified immunity from deliberate-indifference claims for specific gender-dysphoria treatments. Although the court had earlier established that "a *total absence of treatment* for the serious medical needs created by gender dysphoria is unconstitutional," it has since granted qualified immunity when the plaintiff "received extensive treatment in the form of hormone therapy, counseling, and various lifestyle

23

accommodations"—regardless of "the inmate's preferred course of treatment." *Campbell*, 936 F.3d at 549 (quotation marks omitted).[10]

Clark argues that we "should not rely on" *Gibson* and *Campbell*—both from 2019—because they "employed arcane notions of how to treat gender dysphoria." Appellee's Br. at 70 n.14. Clark instead points to the Ninth Circuit's "contemporary" decision—also from 2019—on treatment for transgender inmates. *See id.* (citing *Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019) (holding that a prison psychologist was deliberately indifferent for denying an inmate's requests for sex-reassignment surgery despite providing hormone therapy)). We agree with the other courts of appeals to address the issue and decline to follow the Ninth Circuit's stray decision. *See Edmo v. Corizon, Inc.*, 949 F.3d 489, 505-11 (9th Cir. 2020) (noting the dissent of nine judges from the denial of rehearing en banc).

All of this underscores the absence of clearly established law supporting Clark's gender-dysphoria claims. *See Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018) (noting that out-of-circuit decisions must "clearly foreshadow[] a particular ruling on the issue" (quotation marks omitted)).

---

[10] Neither of the other two out-of-circuit cases cited by the dissent clearly establishes a right to the gender-dysphoria treatments requested by Clark. Those cases simply held that the district court erred in dismissing a *pro se* complaint when completing its screening function under the Prison Litigation Reform Act, 28 U.S.C. § 1915A. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039-40 (9th Cir. 2015); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

24

### 3. *Not a Total Deprivation of Care*

To be sure, some Eighth Amendment violations are "so obvious" that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (involving guards shackling an inmate to a post and leaving him in the sun for seven hours); *see also Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (holding that "any reasonable officer should have realized that" leaving an inmate naked in cells teeming with "raw sewage" for six days constituted cruel and unusual punishment, regardless of specific precedents).

We have applied this exception to deny qualified immunity when officials "failed to take *any* steps to mitigate" an egregious and obvious health risk. *Vega v. Semple*, 963 F.3d 259, 280 (2d Cir. 2020) (denying qualified immunity to officials who "took no action whatsoever" to mitigate prisoners' radon exposure). So total inaction in the face of a "known carcinogen" was "obviously unconstitutional" in light of cases establishing that exposure to environmental tobacco smoke could violate the Eighth Amendment. *Id.* at 276-77 (quotation marks omitted). But the more particularized inquiry required by *Taylor* applies when defendants take *some action* that "allegedly should have been *better*." *Id.* at 280; *cf. post* at 26 n.8 (asserting that talk therapy and psychiatric medication did not constitute "meaningful treatment" for Clark's gender dysphoria).

It is not the case here that Defendants "failed to take *any* steps to mitigate" Clark's gender dysphoria. *Vega*, 963 F.3d at 280. Clark admits that Defendants provided (1) lifestyle accommodations, (2) at least nine sessions of talk therapy, (3) antidepressant medication, (4)

25

two and a half years of hormone therapy, (5) eleven rounds of lab work to monitor that treatment, and (6) five appointments with UConn's endocrinology practice. Although such treatment may not have been Clark's *preferred* course, that "is not the same as deciding to provide no treatment at all."[11] *Campbell*, 936 F.3d at 549. Defendants' actions also fall outside the obviousness exception from *Hope*, 536 U.S. at 741. Nothing about the medical care Clark received amounts to the "obvious cruelty," *id.* at 731, involved in chaining an inmate to a post in the heat or leaving an inmate in raw sewage.

Nonetheless, the district court concluded that Clark suffered a total deprivation of "informed care from a provider qualified to treat

---

[11] The dissent resists this conclusion because Dr. Valletta initially denied Clark hormone therapy under "a blanket policy divorced from applicable medical standards." *Post* at 32; *see also id.* at 28. Putting aside the dissent's characterization of prevailing medical standards at the time of Clark's treatment, we have found deliberate indifference only when an official invokes prison policy with willful blindness to a serious risk of harm. *See Salahuddin v. Goord*, 467 F.3d 263, 282 (2d Cir. 2006) (finding that a doctor who postponed an inmate's liver biopsy under prison policy was not deliberately indifferent because "he was not aware of a substantial risk that postponing the liver biopsy would cause serious harm"). Here, there is no evidence that Valletta knew that following DOC policy with respect to hormone therapy would result in serious harm to Clark. *Cf. Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (concluding that a jury could find deliberate indifference where defendants "ignore[d] the unanimous advice of Johnson's treating physicians, including prison physicians, and appl[ied] the Guideline's substance abuse policy"). To the contrary, the record shows that Valletta referred Clark for an intake appointment with an endocrinologist as soon as he learned he could do so while also providing Clark with general mental-health treatment.

[gender dysphoria]." Special App'x at 64. Neither the district court nor Clark defines "informed care"—a standard that appears nowhere in our deliberate-indifference caselaw. The district court reasoned that it "was obvious to these Defendants that the failure to refer" Clark to "someone competent" would perpetuate Clark's anguish. *Id.* at 58. Clark argues the same on appeal. *See* Appellee's Br. at 46-48. This framing fails for several reasons.

First, Defendants provided various forms of treatment over several years, which Clark disregards simply by limiting the analysis to "informed care from a qualified provider." Defendants' efforts, however unsatisfactory to Clark, were not "*complete* inaction in the face of a risk to a prisoner's health." *Vega*, 963 F.3d at 279 (emphasis added). Adding qualifiers like "informed" or "qualified" to denote a particular standard of care reprises the adequate-treatment analysis for which "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 575 U.S. at 825 (cleaned up). It is also incorrect to say that all of Defendants' care— which helped Clark at one point feel "really good, best ever"— amounted to complete inaction in violation of the Eighth Amendment simply because Defendants were "uninformed."

Second, as a factual matter, the record does not support the allegation that Clark was deprived of informed care. Accepting the allegation that a lack of "expertise in gender dysphoria" rendered Defendants uninformed disregards the expert care Clark received. Valletta procured such care by referring Clark for endocrinology treatment at UConn. Clark admitted to meeting with specialists in hormone treatment five times between September 2017 and February

27

2020. Joint App'x at 117-18. Although Clark claims "never [to have] received the monitoring that would be critical for someone on hormone therapy," Clark also admits that Valletta ordered eleven rounds of lab work. *See id.* at 117-19. Clark thus received some care from qualified specialists.[12]

Third, as a legal matter, even if Clark were deprived of "informed care" for gender dysphoria, that would not violate the Constitution. The Eighth Amendment requires that "inmates receive adequate food, clothing, shelter, and medical care" and that prison officials take "reasonable measures to abate" a "substantial risk of serious harm." *Farmer*, 511 U.S. at 832, 847. "It is well-established" within this legal framework "that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (cleaned up). Treatment by gender-dysphoria specialists is not such a necessity. And a deprivation of such "informed care" alone cannot support a deliberate-indifference claim. This case falls outside the narrow exceptions in our Eighth Amendment cases reserved for

---

[12] Clark's amended complaint is telling. It alleged what Clark now claims it did not: a lack of "adequate care," not a total deprivation of "informed care from a qualified provider." The amended complaint referred to "adequate" care over twenty times, and not once alleged a total deprivation of "informed" care. *See* Joint App'x at 28-42.

28

obvious and egregious violations or total inaction in the face of known hazards.

C.    Objective Reasonableness

Even if the right at issue were clearly established, we have made clear that the official "will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Outlaw*, 884 F.3d at 367. An action is objectively reasonable unless "every reasonable official would have understood that what he is doing violates" a clearly established right. *al-Kidd*, 563 U.S. at 741 (cleaned up); *see also Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) (holding that qualified immunity is warranted unless "no officer of reasonable competence could have made the same choice in similar circumstances" (quotation marks omitted)). This objective standard does not ask "whether the defendant officer acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw*, 884 F.3d at 367.

1.    *Disagreements About Treatment of Gender Dysphoria*

The district court concluded that "no reasonable official would have believed it was lawful to fail to provide informed care," given Clark's "numerous and consistent complaints describing severe anguish." Special App'x at 64-65. This was wrong for several reasons.

First, as the record reflects, medical experts disagree about how to treat gender dysphoria. Defendants' expert stated that there is "considerable growing disagreement within the medical and scientific communities on how to best treat people with gender

29

dysphoria." Dist. Ct. Dkt. 128, Ex. E, at 3. Clark's expert, by contrast, claimed that the WPATH *Standards of Care* are "authoritative for the evaluation and treatment of [gender dysphoria] and related gender conditions." Dist. Ct. Dkt. 133, Ex. 1, at 31. But he also acknowledged that "[t]reatments are individualized for patients" with a gender-dysphoria diagnosis. *Id.* at 29.

Clark claims that WPATH's *Standards* "articulate a professional consensus about the psychiatric, psychological, medical, and surgical treatment and management of gender dysphoria." Appellee's Br. at 9. But Levine, who once chaired the Committee responsible for the *Standards*, criticized recent revisions because they "often minimize or do not seriously consider the considerable gaps in knowledge about outcomes of their recommendations." Dist. Ct. Dkt. 128, Ex. E, at 2; *see also Gibson*, 920 F.3d at 221 (noting that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate"). The fact that Defendants' care did not follow WPATH's *Standards* thus does not mean that *no* competent officers would have thought their course of treatment was lawful.[13]

Second, the relevant caselaw establishes that Defendants' treatment of Clark was objectively reasonable. Most circuits to

---

[13] In his deposition, Levine testified that Clark's treatment was "far less than ideal." Dist. Ct. Dkt. 133, Ex. 4, at 4. But Levine tempered that assessment with an acknowledgment of "prison life and prison culture" and his assessment that Clark's expectations about treatment were "unrealistic." *Id.* at 4, 8. "[L]ess than ideal" medical treatment can be objectively reasonable treatment in the Eighth Amendment context, so it does not follow that every reasonable official would have thought Clark's treatment was unlawful.

consider the issue agree that the Eighth Amendment does not entitle transgender inmates to the full array of gender-dysphoria treatments. *See, e.g., Kosilek*, 774 F.3d at 96; *Gibson*, 920 F.3d at 216. For example, the Tenth Circuit held that prison officials were not deliberately indifferent when they provided a transgender inmate with "psychological counseling and hormone treatments" but denied "surgery or the hormone dosages that [the inmate] wants." *Lamb*, 899 F.3d at 1163. Nothing in our caselaw would cause Connecticut prison officials to think otherwise.

Given the disagreement surrounding gender-dysphoria care, it simply cannot be said that *every* reasonable official would believe that providing lifestyle accommodation, psychotherapy, antidepressants, and a delayed course of low-dose hormones violated Clark's Eighth Amendment rights. "There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 220.

2.  *Subjective Indifference and Objective Reasonableness*

Finally, Clark argues that deliberate-indifference claims should not be subject to an objective-reasonableness analysis because such claims necessarily require a subjective disregard of a substantial risk of harm to the inmate. Appellee's Br. at 65. This argument defies well-established principles of qualified immunity.

The Supreme Court has made clear that qualified immunity turns on an *objective* assessment of the defendant's actions. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Subjective inquiry into a government employee's motivations in acting or refusing to act has been rejected

31

because it generally implicates questions of fact and is therefore incompatible with the expressed policy that summary judgment be readily available to protect government employees from suit." *P.C. v. McLaughlin*, 913 F.2d 1033, 1040 (2d Cir. 1990).

Neither the Supreme Court nor this Court has excepted deliberate indifference from this rule. Nor can we simply collapse *Farmer*'s subjective inquiry into the objective-reasonableness standard. The Supreme Court's decision in *Saucier v. Katz* instructs that qualified immunity's reasonableness inquiry "has a further dimension" and "remain[s] distinct" from constitutional standards. 533 U.S. 194, 204-05 (2001).[14]

The Ninth Circuit, which once employed Plaintiff's collapsed inquiry, abandoned it after *Saucier*. *See Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002). "[I]t is no less true for purposes of the Eighth Amendment than it was in *Saucier* that the qualified immunity inquiry has a further dimension." *Id.* (quotation marks omitted). "Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity." *Id.* at

_____

[14] *Saucier* made clear that the "inquiries for qualified immunity and excessive force remain distinct." 533 U.S. at 204. The Court rejected the view that the inquiries merge because a "reasonable officer" would not think it lawful to use "unreasonable" force. *Id.* at 206. Even if an officer's actions were "unreasonable" in the constitutional sense, "*Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Id.*

32

1050. The Supreme Court similarly applied *Saucier* to treat qualified immunity as analytically distinct from the Eighth Amendment inquiry in *Hope*. 563 U.S. at 739-42.[15]

Defendants are thus entitled to qualified immunity on objective-reasonableness grounds even if they had violated Clark's clearly established rights, which they did not, as explained above. To hold otherwise would improperly excise Eighth Amendment claims from the objective-reasonableness protections of qualified immunity based on irrelevant and impermissible consideration of a defendant's subjective state of mind.

## III. CONCLUSION

In sum, the district court improperly denied qualified immunity to Defendants because there is no clearly established right to specific gender-dysphoria treatments. Defendants also are entitled to qualified immunity because their actions were objectively reasonable. Accordingly, the order of the district court is reversed, and the case is remanded with instructions to grant Defendants' motion for summary judgment on qualified-immunity grounds.

---

[15] Some circuits have collapsed the objective-reasonableness prong of qualified immunity into the subjective element of deliberate indifference. *See Thorpe v. Clarke*, 37 F.4th 926, 939 (4th Cir. 2022); *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). But we decline to follow this approach because it conflicts with the Supreme Court's instructions in *Saucier* and *Anderson*, as well as our objective-reasonableness precedents.

No. 23-7377
*Clark v. Valletta*

BETH ROBINSON, *Circuit Judge*, concurring in part, dissenting in part:

This case is *not* about the right to vaginoplasty, "stronger hormone therapy," or *any* specific treatment for that matter. Maj. Op. at 3. Nor does it present a constitutional challenge to a considered medical judgment as to Clark's reasonable medical needs. *Id.* The majority describes a different case from the one presented in this appeal. Clark's claims here arise from: (1) Defendants Valletta's and Kimble-Goodman's failures to facilitate *any* treatment *directed at* Clark's undisputedly serious medical condition—such as gender informed psychotherapy, hormone treatments, or evaluation for possible surgical interventions—for a period of thirteen months notwithstanding her evident anguish, and (2) Defendant Valletta's subsequent failure to comply with the endocrinologist's hormone treatment plan for Clark's serious medical condition for a period of 20 months despite clear evidence of Clark's distress.

Considering the facts through the proper frame, the district court got it right. Defendants Valletta and Kimble-Goodman are not entitled to qualified immunity under our clearly established law.[1] In concluding otherwise, the majority

---

[1] For the reasons stated in footnote 6 of this opinion, I agree with the majority that Defendant Bush is entitled to qualified immunity. As to Valletta and Kimble-Goodman, I would affirm the district court's denial of qualified immunity.

improperly relies on disputed evidence proffered by Defendants; defines the right at issue too narrowly—both in light of Clark's complaint and arguments, and the generally applicable law; and ignores the distinction in the caselaw between challenges to prison medical providers' considered medical judgments and challenges, like Clark's, to blanket policies that are inconsistent with medical standards of care and wholesale failures to comply with otherwise adequate treatment plans. For these reasons, I respectfully dissent.

## I. The Record

We have jurisdiction to immediately review a district court's denial of qualified immunity based only on "stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).[2] There are no stipulated facts on appeal, and therefore, we can only credit the facts that Clark alleged are true at summary judgment.[3] The critical events underlying Clark's claims fell into two phases: (1) from April 2016 through July 2017, during

---

[2] In quotations from caselaw, the appendices, and the parties' briefing, this dissent omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

[3] To the extent that the majority incorporates other evidence, such as Defendants' expert's views about standards of care, or Valletta's characterization of Clark's expectations and other psychiatric diagnoses, it strays from this requirement. *See* Dissent at 11–12.

2

which Clark was denied care directed at her gender dysphoria despite tremendous anguish; and (2) from September 2017 to August 2019, during which time Clark was denied care consistent with her care plan despite her repeated urgent requests.

A. *April 2016 to September 2017*

Clark has been incarcerated in the custody of the Connecticut Department of Corrections ("CDOC") since 2007. Around May 2016, following Clark's self-report, a CDOC medical provider diagnosed Clark with gender dysphoria.[4] Gender dysphoria is clinically significant distress associated with an incongruence between a person's gender identity and assigned sex at birth. In July 2016, Clark attempted to castrate herself by tying a shoelace around her penis and scrotum and cutting her scrotum with a pair of nail clippers. She was taken to the emergency room at an area hospital and treated for her wounds. A CDOC psychologist noted that Clark's "high level of psychological distress relative to [her] gender dysphoria" led to her self-castration attempt. Jt. App'x 75 ¶ 23.

---

[4] Many of the cases discussed later in this dissent use the term "gender identity disorder" rather than "gender dysphoria." As the First Circuit noted "the term 'gender identity disorder' has . . . been replaced with the term 'gender dysphoria' in the medical community." *Kosilek v. Spencer*, 774 F.3d 63, 69 n.1 (1st Cir. 2014). Consistent with the record in this case, I will use the term "gender dysphoria."

CDOC mental providers categorized her risk level as a level five, which is the most severe level of risk in CDOC's classification system.

In July 2016, Clark was transferred to Garner Correctional Institution ("Garner") where she submitted a request to see a doctor about her gender dysphoria. Over the next year, she received care from two CDOC clinicians: Dr. Gerald Valletta, a medical doctor and a principal physician at Garner at the time, and Advanced Practice Registered Nurse ("APRN") Barbara Kimble-Goodman, a mental health provider.

Clark first met with Valletta in August 2016. During this first meeting, Valletta treated Clark's wounds from her attempted self-castration and made the following note: "[Clark] referred to M[ental] H[ealth] [and] case manager." Dist. Ct. Dkt. No. 137 at 55 (sealed). He couldn't recall whether he took any affirmative steps to refer Clark to a mental health provider. However, ten days after their initial appointment, Clark met with a mental health provider who noted that she had clinically significant distress and a strong desire to be rid of her primary and secondary male characteristics.

In September and October 2016, Clark submitted written requests asking for treatment for her gender dysphoria—namely, "transition-related health care." Dist. Ct. Dkt. 133-19 at 27, 29. She wrote, "It would be impossible to overstate the

4

internal psychological trauma I experience every moment of every day I go without treatment." *Id.* at 29. And she pled, "[P]lease, with my entire being, allow me access to transition-related health care." *Id.*

Gender dysphoria that goes untreated or is insufficiently treated poses a risk to the individual's physical and mental health. The World Professional Association for Transgender Health ("WPATH") Standards of Care are authoritative for the evaluation and treatment of gender dysphoria. Treatment of gender dysphoria under the WPATH Standards of Care is individualized for patients and may include gender-informed psychotherapy, gender confirming hormonal treatment, and gender affirming surgeries.[5]

Ordinarily, when an incarcerated person requires treatment beyond the capabilities of a CDOC provider, the provider may refer a patient to an outside specialist. To do so, the provider submits a request for referral to the CDOC's Utilization Review Committee ("URC"). When a patient is approved to see a specialist and that specialist recommends the incarcerated patient return for a follow-up appointment, the principal physician is responsible for submitting further requests to the URC for each follow up appointment.

---

[5] Though we are to consider only Clark's allegations and evidence in this context, I note that Defendants' own expert's list of treatments that may be appropriate for gender dysphoria includes these same treatments. *See* Dist. Ct. Dkt. No. 128-7 at 3–4 ¶¶ 9-12.

Valletta had no training in treating gender dysphoria, and no prior experience treating people for gender dysphoria. But he knew what gender dysphoria was, knew Clark's diagnosis, and knew it was a chronic condition. He was responsible for referring Clark to a specialist if necessary. Nevertheless, in response to Clark's pleas, Valletta did not request a referral from the CDOC URC to facilitate even an *assessment* as to appropriate course of care in her case. Instead, he responded to Clark's early September request:

> As per CMHC/DOC policy, transitional treatment would be <u>CONTINUED</u> if inmate already has been on medication in the community, but transitional treatment will not be initiated while . . . incarcerated.

Dist. Ct. Dkt. No. 133-19 at 27 (September request).

He likewise responded to her late September request:

> I'm informed that current practices @ CMHC/DOC are that hormonal/transitional therapy will be continued but not initiated upon incarceration.

*Id.* at 29. In other words, Valletta denied Clark any evaluation or treatment focused on her gender dysphoria not based on his own medical assessment—he knew he was not in a position to offer one—but rather, based on a purported unwritten policy barring an individual who was not already receiving gender affirming care from receiving treatment for gender dysphoria while incarcerated without regard to medical need or standards of care.

6

Clark first saw Kimble-Goodman in November 2016. Kimble-Goodman conducted a mental health evaluation and could prescribe mental health medications. Kimble-Goodman had no training regarding gender dysphoria. In the initial appointment, Clark told Kimble-Goodman about her distress and that her male genitalia were "poisoning" her. Jt. App'x 78 ¶ 37. Kimble-Goodman recommended a follow-up appointment in three months. When they met again in February 2017, they discussed medication for *depression*, which Clark was apprehensive about taking.

Between November 2016 and July 2017, Kimble-Goodman saw Clark several times. She did not treat Clark specifically for her *gender dysphoria*, but offered Clark talk therapy and a prescription for antidepressants. She knew what gender dysphoria was, and that Clark was diagnosed with the condition, but she made no effort to facilitate a referral for gender informed psychotherapy or any other treatment.

In the meantime, it was not until July 2017, a year after Clark attempted to physically castrate herself with nail clippers, that Valletta submitted the necessary paperwork to refer Clark to an outside endocrinologist for evaluation for hormone treatment. The record isn't clear as to whether he did so because the purported CDOC policy had changed or because CDOC management prodded him to do so

7

after students at the Columbia University School of Law threatened litigation. Valletta referred Clark to an endocrinologist two months later.

During this time, Clark suffered considerable psychological distress. She reported to Kimble-Goodman that she felt "poisoned" every day, and said, she felt like she was "dying." Dist. Ct. Dkt. No. 137 at 61 (sealed). Valletta's and Kimble-Goodman's failure to make any appropriate referrals despite their own lack of qualifications to treat gender dysphoria during this thirteen-month period underlies one aspect of Clark's deliberate indifference claim.

*B. September 2017 to October 2019*

Once Valletta facilitated an assessment for one gender dysphoria treatment modality—hormone treatment—he failed to facilitate compliance with the recommended treatment plan.

Clark met with an endocrinologist in September 2017. That specialist recommended that Clark: (1) start hormone therapy, (2) undergo lab work in four weeks and again at twelve weeks to monitor her hormone levels, and (3) follow up with the endocrinologist in three months, on or around December 14, 2017. Ordering lab work and facilitating necessary follow-up appointments were among Valletta's responsibilities. Clark didn't have the recommended follow-up appointment in three months despite receiving approval for it. Rather, as set forth

8

more fully below, she didn't see the endocrinologist again until a year and eight months after her follow-up appointment should have occurred.

Clark began hormone therapy under Valletta's supervision in September 2017. Her October 2017 bloodwork reflected that her overall testosterone level was within the range of a normal adult male. In November, she reported to Kimble-Goodman benefits from hormone therapy including improved sleep, appetite, motivation, and mood.

That soon changed. Her January bloodwork revealed that her testosterone level had increased, indicating that her hormone therapy was ineffective.

In April 2018, Clark requested a health services review of her treatment, and emphasized that she did not believe she was receiving a high enough dose of hormones. She described her distress at having to shave three times daily, and the absence of the expected feminizing effects of the hormones. (She also noted that for the fourth or fifth time, her prescription had not been refilled.) When she met with Valletta after that she reported that she was frustrated at the low level of her hormone dosage relative to other transgender inmates. In response, he told her he would run additional lab work, and he reassured her about the plan that was in place. He made no note of the fact that Clark was many months overdue for her recommended follow-up appointment with the endocrinologist. Clark's

subsequent May 2018 blood work showed that her testosterone levels had increased rather than decreased.

In June 2018, Clark reported to Kimble-Goodman that she was stressed because she had to shave multiple times each day; she didn't think she was getting the correct dosage of her hormones.

And then in July 2018, Clark again requested a health service review. She reported that she felt traumatized by her facial hair, chest hair, and other signs that the hormones weren't having the expected effect, and wrote "I do not know how to communicate how much pain I am in." Dist. Ct. Dkt. No. 133-19 at 15. She emphasized that she believed she needed a higher dosage of hormones to reduce her muscle mass, and wrote, "Please, help me." *Id.* Again, Valletta, whose responsibilities included scheduling recommended follow-up appointments with the endocrinologists, did nothing to schedule the three-month follow-up appointment that was by then more than six months overdue.

Again in February 2019, Clark submitted an inmate request asking whether her hormone medication was properly dosed. The response section of the form indicates only that Clark was seen. By this point, Clark was well over a year overdue for her three-month follow-up with the endocrinologist.

And in June 2019, Clark submitted a grievance noting that she had asked "medical" in writing to let her know if she would be seeing the endocrinologist soon, and the request was answered by a mental health worker. She asked why her medical requests were continually being ignored by the medical department. CDOC responded that because the endocrinology department was backed up it was difficult to get appointments, but that she had one scheduled within the next month.

Clark finally had her second appointment with an endocrinologist in August 2019—approximately twenty months later than recommended. The endocrinologist recommended a follow-up appointment in two months after Clark underwent lab testing. The endocrinologist noted that she would benefit from a higher dose of hormones, but that updated lab work was necessary. Her September 2019 lab test revealed that her testosterone had *increased*. And in October 2019, the endocrinologist *doubled* her hormone therapy medication and recommended repeated lab work in three months and a follow-up appointment in

four months. At the next follow-up visit, the endocrinologist increased her dosage again. Clark was then transferred to another facility in March 2020.[6]

To summarize, though Clark was eventually referred to an endocrinologist, Valletta, her primary care physician, failed to follow the protocol the endocrinologist prescribed, including failing to schedule the recommended follow-up appointment for *twenty months* beyond the recommended time. He did so despite multiple test results indicating that the hormone therapy was ineffective. During this period, Clark continued to experience and communicate considerable distress around her hormone levels while Valletta took no steps to schedule a follow-up assessment as required by her treatment plan. This wasn't because Valletta made a considered judgment that she did not need higher levels of hormones. It was because he simply ignored his responsibility to facilitate Clark's follow-up evaluations.

---

[6] During this period, Clark also briefly consulted with Defendant Richard Bush, a licensed clinical social worker. My dissent does not extend to the qualified immunity determination as it relates to Bush. By the time he saw Clark, Bush knew she was being seen by APRN Reischerl, a psychiatric APRN, for evaluation in connection with her gender related needs. For that reason, I do not contend that clearly established law put Bush on notice that his failure to independently seek additional mental health treatment for Clark's gender dysphoria would violate her constitutional rights. Therefore, I concur with the majority that the district court erred in denying Bush qualified immunity.

## II.     Qualified Immunity Analysis

We generally lack jurisdiction to consider a denial of summary judgment, but we may review a district court's order denying a motion for summary judgment based on qualified immunity "to the extent the denial turns on an issue of law." *Terebesi v. Torreso*, 764 F.3d 217, 229 (2d Cir. 2014).  We may exercise appellate jurisdiction "only for the limited purpose of deciding whether, on the basis of stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law."  *Id.*  "Within these constraints," we review the district court's assessment without deference.  *Id.*

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).  For a right to be clearly established, it must be "sufficiently clear that every reasonable officer would have understood that [the officer's conduct] violates that right."  *Id.*

The majority's analysis is infected by two critical flaws: First, the majority misdefines the right at issue here.  And second, the majority fails to recognize the distinction between a constitutional challenge to a considered medical judgment

13

by a prison medical official, and a challenge to conduct that is not driven by any informed medical judgment. I consider each in more detail.

*A. Defining the Clearly Established Right*

The majority defines the right at issue in this case as an incarcerated person's "right to a specific course of gender-dysphoria treatment, including hormone therapy and sex-reassignment surgery." Maj. Op. at 21. There are two problems with this characterization, one factual and one legal. The factual problem is that the majority's framing ignores Clark's actual claims in this case and instead substitutes a narrative that focuses on the arguably more provocative argument— not advanced in this case—that on this record Clark had a clearly established right to gender affirming surgery upon request. Second, it runs headlong into the Supreme Court's oft-repeated admonition that a "case directly on point" is not required. *See e.g., Taylor*, 575 U.S. at 825; *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) ("An overly narrow definition of the right can effectively insulate the government's actions by making it easy to assert that the narrowly defined right was not clearly established."). I elaborate on each concern below.

14

i. <u>Clark's Claims</u>

The case the majority has decided bears little resemblance to the case presented on appeal. Clark's complaint is *not* premised on the claim that the defendants violated her clearly established constitutional rights by failing to arrange for "stronger hormone therapy and a vaginoplasty." Maj. Op. at 3. Her complaint is that she didn't get *any* care directed at her gender dysphoria for thirteen months, and that even once she began getting *some* care, Defendants prevented her from complying with the treatment plan.

Clark's fifteen-page complaint lays out a narrative consistent with the facts recounted above. It identifies a host of potential treatments Defendants denied Clark, and emphasizes that Clark has never been evaluated by a medical provider specializing in caring for transgender people. Jt. App'x 37 ¶ 39. Clark's deliberate indifference claim is predicated on Defendants' failure to provide her "adequate and necessary medical treatment . . . consistent with prevailing medical standards," which may include a number of identified treatments. It does not identify the denial of surgery (for which she was never even *evaluated*) as the crux of her claim. Jt. App'x 39 ¶ 47.

15

Likewise, nothing in the district court's extensive and thoughtful decision turns on any defendant's failure to schedule gender affirming surgery for Clark. Instead, the district court summarized its assessment as follows:

> Here, the experts agree that Ms. Clark was denied adequate care. It took years, and this litigation, for DOC officials to refer Ms. Clark to see someone with experience and expertise in treating gender dysphoria. It took over ten months after her self-castration attempt to receive any care aside from a referral to a mental health provider that had no experience or expertise in treating patients with gender dysphoria. Then, when she received some treatment in the form of hormone therapy, the DOC failed to follow the medical protocol prescribed by that specialist and ignored multiple test results which reflected the increasing need to follow the prescribed protocol. The record is devoid of any evidence of the DOC's attempt to follow the protocol or of any documentary scheduling or other impediments to following the protocol. During this time, she received some treatment for her dysphoria in the form of talk therapy but said "therapy" was conducted by someone without any experience or expertise in treating someone with gender dysphoria. When eventually Ms. Clark was referred to someone with experience and expertise in treating someone with gender dysphoria, the DOC continued to fail to provide Ms. Clark with the treatment recommended by that expert. This is not adequate care.

*Clark v. Quiros*, 693 F. Supp. 3d 254, 287–88 (D. Conn. 2023). *That's* what Ms. Clark's claims are about. This simply isn't a denial-of-gender-affirming-surgery case.[7]

### ii. Framing the Right

In any event, the law doesn't support the majority's narrow framing of the right in question, focusing on the "right to specific gender-dysphoria treatments." Maj. Op. at 13.

Crucial to the "clearly established" inquiry is the level of generality at which the right is defined. *See LaBounty*, 137 F.3d at 73 ("The chronic difficulty with this analysis for courts is in accurately defining the right at issue."); *see also* John C. Jeffries, *What's Wrong with Qualified Immunity?*, 62 Fla. L. Rev. 851, 852 (2010) ("[D]etermining whether an officer violated 'clearly established' law has proved to be a mare's nest of complexity and confusion."). A right is not clearly defined by a broad imperative like the prohibition against unreasonable searches, but "a case directly on point" is not required. *Taylor*, 575 U.S. at 825; *see also Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996) ("A court need not have passed on the identical course of conduct in order for its illegality to be 'clearly established.'").

---

[7] Counsel for Clark confirmed this at oral argument. She was asked both "do we have to address whether there is a clearly established constitutional right to a vaginoplasty in order to resolve the case," Oral Arg. at 27:35–41, and "do we have to address whether there is a clearly established constitutional right to hormone treatment," *id.* at 27:43–45. She answered "no," *id.* at 27:41–43, and "absolutely not," *id.* at 27:46–47.

As a general matter, the Eighth Amendment protects against prison officials' deliberate indifference to serious medical needs. The term "deliberate indifference" first appeared in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), where the Supreme Court held that the government must provide medical care to address the serious medical needs of incarcerated persons. It distinguished between "deliberate indifference to serious medical needs" of prisoners and "negligen[ce] in diagnosing or treating a medical condition." *Id.* at 106. Only the former violates the Eighth Amendment. *Id.* Since *Estelle*, a two-prong framework has developed: plaintiffs must allege (1) a serious medical need, and (2) that prison officials who were both aware of that need and capable of addressing it did not do so. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

It is true that the Supreme Court has regularly required a high level of specificity in *Fourth Amendment* claims, but it has not required the same level of granularity in Eighth Amendment claims. *Compare City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12–13 (2021) ("Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.") *with Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (stating that "the pre-existing law was not in controversy" because it had long been established that

18

a "prison official may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection against violence while in custody if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (the test for qualified immunity is not whether "the very action in question has previously been held unlawful" but is whether "in the light of pre-existing law the unlawfulness [is] apparent"). *See also Thorpe v. Clarke*, 37 F.4th 926, 940 (4th Cir. 2022) ("[W]hile the Court has regularly insisted on highly particularized law in the Fourth Amendment context, it has not done the same with Eighth Amendment claims.").

Our review of qualified immunity in the Eighth Amendment deliberate-indifference context bears this out. In *Hathway v. Coughlin*, we addressed a plaintiff's claim that the prison doctor and other defendants showed deliberate indifference to his chronic hip pain. There, a specialist informed prison officials that the plaintiff suffered from a degenerative disease in the left hip joint. 37 F.3d at 65. The plaintiff complained of pain at least forty-nine times over the course of three years. *Id.* In response, the prison doctor prescribed new orthopedic shoes, recommended that he be housed on a first-floor cell and be exempted from heavy lifting and prescribed him pain killers on most occasions. *Id.* Significantly, the

prison doctor did not disclose to Hathaway that he had broken pins in his hip, did not discuss the possibility of surgery with him despite Hathaway's sudden resurgence of hip pain, and did not refer him for a surgical reevaluation until more than two years after the x-ray showing the broken pins, despite requests for treatment from Hathaway and advocates on his behalf. *Id.*

We concluded that, based on the facts as alleged in the complaint, that the plaintiff had plausibly alleged the defendants acted with deliberate indifference to his serious medical need and that the plaintiff's "federal rights [were] well-established." *Id.* at 67. If a jury were to find deliberate indifference, the doctor would not be "entitled to qualified immunity because it would not be objectively reasonable for him to believe his conduct did not violate [the plaintiff's] rights." *Id.* at 69. In so concluding, we did not assess whether existing caselaw established a specific right to treatment for pain caused by broken pins in the hip, or even orthopedic pain more generally. Instead, we focused on the mere presence of deliberate indifference to Hathaway's serious medical needs, over a dissent arguing otherwise. *Id.* at 71.

Likewise, in *LaBounty v. Coughlin*, we addressed the plaintiff's claim that he was exposed to asbestos while incarcerated and the defendants knowingly failed to protect him from such exposure. 137 F.3d at 72. We concluded that the district

20

court's formulation of the right at issue—"to be free from crumbling asbestos"—was too narrow. *Id.* at 74. In doing so, we said, "Such a restricted view of the right conflates the specific conduct at issue with the defined right running afoul of this Court's recognition that a court need not have passed on the identical course of conduct for its illegality to be 'clearly established.'" *Id.* We then concluded that "the right to be free from deliberate indifference, established in *Estelle* . . . best encompasses the alleged conduct." *Id.* That right was clearly established. *Id.* We reaffirmed *LaBounty*'s holding a few years later in *Warren v. Keane*, 196 F.3d 330, 333 (2d Cir. 1999), which involved exposure to environmental tobacco smoke.

And in *Collymore v. Krystal Myers, RN*, we considered a claim that prison officials failed for years to provide an incarcerated individual with adequate medical care for painful infections and lesions on his scalp. 74 F.4th 22 (2d Cir. 2023). Noting that no Supreme Court or Second Circuit cases had held that "a scalp condition causing painful open sores is a serious medical need," the district court dismissed Collymore's claims as barred by officials' qualified immunity. *Id.* at 29–30. We reversed, emphasizing that "Eighth Amendment claims for the deprivation of medical care are not analyzed body-part by body-part." *Id.* at 30. What was relevant was that Collymore had plausibly alleged "severe and unmanaged pain." *Id.* The "absence of precedents involving scalp infection" was

21

irrelevant. *Id.* In so holding, we didn't break new legal ground; rather, we applied well-established Eighth Amendment law. Though the issue in Collymore was whether the plaintiff suffered from a serious medical condition—a question that is decidedly not at issue here—our observation that we don't analyze qualified immunity defenses to claims of deprivation of medical care "body-part by body-part" applies with equal force in this context. *Id.*

And that's where the majority gets it wrong. It analyzes the qualified immunity question at the level of a specific diagnosis and course of treatment. As reflected above, our Eighth Amendment caselaw doesn't support that approach. *See also Vega v. Semple*, 963 F.3d 259, 276–77 (2d Cir. 2020) (concluding that officers weren't entitled to qualified immunity in case involving *radon* exposure because a prior precedent had concluded that exposure to *environmental tobacco* was unconstitutional).

Nor do our sister circuits require such specificity. *See, e.g., Pfaller v. Amonette*, 55 F.4th 436, 453 (4th Cir. 2022) (rejecting the notion that the precedent on the precise illness is required because "requiring such specificity in the case of a treatment provider's decisions would allow a doctor limitless opportunity to deny medical care unless the precise required treatment for a specific underlying illness had been addressed by our Court"); *Estate of Clark v. Walker*, 865 F.3d 544,

22

553 (7th Cir. 2017) ("For purposes of qualified immunity, [the Eighth Amendment right to treatment for serious medical needs] need not be litigated and then established disease by disease or injury by injury."); *Russell v. Lumitap*, 31 F.4th 729, 737–38 (9th Cir. 2022) ("It is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a § 1983 claim based on one of those conditions to survive qualified immunity."); *Murray v. Department of Corrections*, 29 F.4th 779, 790 (6th Cir. 2022) ("Courts have frequently rejected officials' contentions that a legal duty need be litigated and then established disease by disease or injury by injury.").

The majority's reliance on *Taylor v. Barkes* to support its treatment-specific framing of the issue here is misplaced. Maj. Op. at 16, 21, 25. In *Taylor*, the defendants had not personally interacted with the incarcerated individual who took his life; at issue was the adequacy of their generic suicide-screening measures for all incarcerated individuals. 575 U.S. at 824. The Court concluded that qualified immunity applied because there was no caselaw identifying what minimum procedures a prison had to use to screen individuals for suicidality. *Id.* at 826–27.

Had the prison officials in *Taylor* failed to act after knowingly engaging with an actively suicidal inmate, the analysis would have been completely different.

23

*See, e.g.*, *Troutman v. Louisville Metro Department of Corrections*, 979 F.3d 472, 482 (6th Cir. 2020) ("Inmates do not have a guaranteed Eighth Amendment right to be screened correctly for suicidal tendencies, however, prison officials *who have been alerted* to a prisoner's serious medical needs [including suicidality] are under an obligation to offer medical care to such a prisoner.") (emphasis added)); *Smith-Dandridge v. Geanolous*, 97 F.4th 569, 575–76 (8th Cir. 2024) (concluding that "deliberate indifference to serious medical needs" includes "the risk of suicide," and assessing whether defendants in that case knew individual was at substantial risk for suicide); *Short v. Hartman*, 87 F.4th 593, 613 (4th Cir. 2023) ("An officer's failure to act if they demonstrably knew or had reason to know that a suicide was imminent constitutes deliberate indifference."). The majority's suggestion that *Taylor* abrogates the principle that prison officials act with deliberate indifference when they are aware of a prisoner's serious medical needs and fail to take action, and its suggestion that *Taylor* calls for a diagnosis-by-diagnosis or treatment-by-treatment analysis, stretches that decision far beyond its context and analysis.

When prison medical providers know that an incarcerated individual suffers from a serious medical condition, they are obliged to conduct an individualized assessment and provide adequate care—not necessarily the best care, or the care the individual would prefer—but reasonable care. *See Farmer v.*

24

*Brennan*, 511 U.S. 825, 832 (1994) (stating that the Eighth Amendment "imposes duties" on prison officials including "ensur[ing] that inmates receive adequate . . . medical care"); *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (*en banc*) (stating that a ban on certain treatments for gender dysphoria would "conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs"). That's true whether the condition is ongoing hip pain caused by broken hardware from a prior surgery, *Hathaway*, 37 F.3d at 65, a painful scalp condition, *Collymore*, 74 F.4th at 30, a heart attack, appendicitis or a bowel obstruction, *Russell*, 31 F.4th at 737–38, or any other serious health condition. There is no exception to this well-established constitutional obligation if the serious medical condition happens to be gender dysphoria.

### B. *Blanket Policies or Total Inaction versus Considered Medical Decisions*

The majority's analysis misses another key feature of the applicable caselaw: the distinction between a challenge to a prison official's considered medical judgment on the one hand, and one to an official's wholesale failure to act, or action in reliance on blanket policies rather than individual assessment, on the other. This distinction flows from *Estelle* itself, which clearly distinguished between "deliberate indifference to serious medical needs" of prisoners and "negligen[ce] in diagnosing or treating a medical condition." 429 U.S. at 106.

25

The caselaw involving medical care for incarcerated transgender individuals bears out this distinction. First are cases, like this one, involving wholesale failure to provide relevant medical care, often based on blanket policies that are not anchored in accepted medical standards.[8]

The most prominent example is the Seventh Circuit's decision in *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011). In *Fields*, the Seventh Circuit concluded that enforcement of a statutory blanket prohibition of hormone therapy and gender affirming surgery for transgender inmates would constitute deliberate indifference to inmates' serious medical needs. *Id.* at 559. That court explained, "Just as the legislature cannot outlaw all effective cancer treatments for prison inmates, it cannot outlaw the only effective treatment for a serious condition like [gender identity disorder]." *Id.* at 557; *see also Roe v. Elyea*, 631 F.3d 843, 859 (7th

[8] The majority tries to situate this case outside of the wholesale failure to act category, asserting that Clark received a progression of care from "talk therapy, medication for depression, and later, hormone therapy." Maj. Op. at 20. The majority thus argues that there was never a failure to treat Clark for gender dysphoria. *Id.* The record belies that claim. Valletta himself explained that he would not provide treatment for the Clark's gender dysphoria because a policy barred initiation of "transitional treatment" for inmates who first present with gender dysphoria while incarcerated. Dist. Ct. Dkt. No. 133-19 at 27 (September request). And generic talk therapy and depression medications are no more meaningful treatment for the severe gender dysphoria Clark exhibited than they would be for a palpable breast lump or a broken leg.

Cir. 2011) (explaining that "inmate medical care decisions must be fact-based with respect to the particular inmate" rather than the product of categorical rules).

The Ninth Circuit addressed a similar circumstance in which defendants responded to a transgender inmate's medical needs by applying a blanket policy not grounded in accepted medical standards. *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015). The court concluded that the plaintiff, who had been denied any evaluation by a gender dysphoria specialist, plausibly alleged a deliberate indifference claim. *Id.* at 1039–40. *See also Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference"); *Hoptowit v. Ray*, 682 F.2d 1237, 1252–53 (9th Cir. 1982) ("Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems."), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

The Fourth Circuit addressed a similar situation in *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013). There, the plaintiff, like Clark here, had engaged in self-mutilation in an effort to self-treat her gender dysphoria. *Id.* at 522. The defendants did provide her some treatment directed specifically at her gender dysphoria. *Id.* But they declined to refer her for evaluation for surgery despite

evidence that the treatments they were providing were not mitigating her distress. *Id.* at 522–23. There is no indication that the failure to refer was driven by a considered medical judgment; to the contrary, the only medical evidence supported her request for further evaluation. The Fourth Circuit concluded that the plaintiff had plausibly alleged deliberate indifference, and it reversed the district court's dismissal of the plaintiff's Eighth Amendment claims. *Id.* at 526. In reaching this conclusion, the court emphasized, "[J]ust because [the defendants] have provided [the plaintiff] with *some* treatment consistent with the [gender identity disorder] Standards of Care, it does not follow that they have necessarily provided [the plaintiff] with *constitutionally adequate* treatment." *Id.*

The majority contends some of these cases are irrelevant because they arise from a different procedural posture. But the majority does not even attempt to explain how the policy Valletta enforced is in any way materially different from the blanket prohibition of hormone therapy and gender affirming surgery for transgender inmates that constituted deliberate indifference to inmates' serious medical needs in *Fields*, 653 F.3d at 559.

In marked contrast to these cases are those in which an incarcerated individual challenges a considered medical decision by prison medical providers. For example, in *Campbell v. Kallas*, the Seventh Circuit extended qualified

28

immunity to prison officials who made a considered medical decision to deny the plaintiff's request for gender affirming surgery. 936 F.3d 536 (2019). In that case, after the plaintiff raised her gender identity concerns with a prison psychologist, the prison's Gender Dysphoria Committee, which was responsible for handling medical treatment of transgender inmates, hired a gender dysphoria expert to evaluate the plaintiff. *Id.* at 540. The expert diagnosed the plaintiff with gender dysphoria and recommended that the plaintiff start hormone therapy and be given lifestyle accommodations but didn't recommend gender affirming surgery. *Id.* at 540–41. The Committee adopted the specialist's recommendations and the plaintiff received the recommended care. *Id.* at 541. The plaintiff subsequently filed several requests for gender affirming surgery. *Id.* The Committee continued to consult with the retained expert, who concluded that the plaintiff could be a candidate for surgery, but that the conditions of incarceration supported more conservative approaches. *Id.*

Framing the inquiry as "whether then-existing caselaw clearly established a constitutional right to gender-dysphoria treatment beyond hormone therapy," the Seventh Circuit concluded that the defendants were entitled to qualified immunity. *Id.* at 546–47. Specifically, the court said it wasn't clearly established "that medical professionals violate the Eighth Amendment when they provide

hormone therapy but decide—*after extensive deliberation and consultations with an outside expert*—to deny sex-reassignment surgery." *Id.* at 547 (emphasis added). The court distinguished its decision in *Fields* by emphasizing that in that case "prison officials refused to provide *any* treatment for [a] serious disease[] based solely on categorical rules." *Id.* In contrast, in *Campbell*, the prison officials "consulted an expert in the field and, facing a gray area of professional opinion, decided to deny the 'last and most considered step' of gender-dysphoria treatment." *Id.*

The First Circuit similarly concluded that prison officials didn't violate the Eighth Amendment when they declined to authorize gender affirming surgery in addition to the hormone therapy and mental health treatment the transgender inmate was receiving. *Kosilek*, 774 F.3d at 67. The *Kosilek* court recounted the extensive medical assessments that led to the officials' decision. *Id.* at 69–82. And it emphasized that the officials were presented with two treatment plans developed by medical experts and "reasonably commensurate with the medical standards of prudent professionals," and they chose the plan that conflicted with the plaintiff's requests. *Id.* at 90. In so concluding, it stressed that any blanket policy regarding gender affirming surgery "would conflict with the requirement

that medical care be individualized based on a particular prisoner's serious medical needs." *Id.* at 91.

Similarly, in *Lamb v. Norwood*, the challenged treatment decision resulted from informed medical judgment, not a blanket policy or mere failure to act. 899 F.3d 1159, 1162–63 (10th Cir. 2018) ("*Lamb II*"). In that case, a transgender inmate was receiving weekly counseling and hormone therapy. *Id.* She wanted different hormone dosages and surgery. *Id.* The prison's medical director and a panel of practitioners that included specialists in psychiatry and behavioral psychology concluded the treatment plan was appropriate. *Lamb v. Norwood*, 262 F. Supp. 3d 1151, 1157 (D. Kan. 2017) ("*Lamb I*"). The Tenth Circuit held that the defendants were entitled to qualified immunity for their informed judgment. *Lamb II*, 899 F.3d at 1162–63.[9]

---

[9] In *Gibson v. Collier*, the Fifth Circuit held that "a state does not inflict cruel and unusual punishment by declining to provide [gender confirming surgery] to a transgender inmate." 920 920 F.3d 212, 215 (5th Cir. 2019). It did so on the *pro se* incarcerated plaintiff's "sparse record," which only included the WPATH Standard of Care and was devoid of "witness testimony or evidence from professionals in the field." *Id.* at 220–21. Its categorical holding is based on the premise that "[t]here is no medical consensus that [gender conforming surgery] is necessary or even effective treatment for gender dysphoria." *Id.* at 223. In other words, it concludes that because medical professionals may disagree generally about the most effective course of treatment for gender dysphoria, a prison official's decision to deny that treatment can *never* violate the Eighth Amendment. That decision is out of step with every other court to address the issue—none of which conclude that Eighth Amendment *mandates* a specific treatment, but all conclude that incarcerated persons are entitled to an informed, adequate care based on an individualized assessment of their serious medical needs.

The critical question driving the analysis in all of these cases is not whether the plaintiff sought a particular treatment—be it counseling, hormone therapy, or surgery. The critical question is whether the challenged medical decision was the product of a blanket policy divorced from applicable medical standards, or an individualized assessment consistent with prevailing medical standards. That's why the Seventh Circuit's respective decisions in *Fields* and *Campbell* are entirely consistent.

In this case, there was no reasoned medical decision to deny Clark any informed assessment of her gender dysphoria—including evaluation by an endocrinologist for possible hormone treatment—for over a year. There was no Gender Dysphoria Committee consulting with a qualified expert, *Campbell*, 936 F.3d at 540; there were no extensive medical assessments leading to two competing treatment plans "reasonably commensurate with the medical standards of prudent professionals," *Kosilek*, 774 F.3d at 90; and there was no medical evaluation by a medical director and a panel of practitioners that included specialists in psychiatry and behavioral psychology, *Lamb I*, 262 F. Supp. 3d at 1157. There was simply Valletta's and Kimble-Goodman's blanket refusal to pursue any treatment directed at Clark's gender dysphoria for over a year despite her evident anguish, purportedly pursuant to an across-the-board policy, and then

Valletta's utter refusal to follow up with the recommended treatment for more than a year and a half after that, despite multiple blood tests revealing that the hormone dosages were ineffective.

The cases relied upon by the majority do not support its position. This case falls squarely in the camp of the likes of *Fields*, *Rosati* and *De'lonta*. And the outcome is governed by our decision in *Hathway* in which we explained, "A jury could infer deliberate indifference from the fact that [the defendant] knew the extent of [the plaintiff]'s pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the plaintiff]'s situation." 37 F.3d at 68. If Valletta and Kimble-Goodman are found deliberately indifferent, they would not be "entitled to qualified immunity because it would not be objectively reasonable for [them] to believe [their] conduct did not violate [Clark's] rights." *Id.* at 69.

Moreover, even if the proper focus in the cases was the *specific treatments* provided rather than whether the treatment decisions were informed by medical judgment consistent with prevailing professional standards, the plaintiffs in all three of the above cases relied upon by the majority—*Kosilek*, *Campbell*, and *Lamb II*—received the hormone therapy that Clark was completely denied for over a year following her anguished act of self-mutilation, and was effectively denied for

twenty months after that. Again, that's not the right way to look at these cases; but even following the majority's own flawed framework, there is scant caselaw supporting the suggestion that denying medically indicated hormone therapy cannot amount to deliberate indifference.[10]

* * *

Today, the majority creates a rule that shields prison officials from denying inmates medical care unless and until courts have specifically concluded that an inmate has the right to that specific treatment for that specific serious medical condition. That requirement is at odds with the Supreme Court's guidance, this Court's caselaw, and that of our sister circuits. And it transforms qualified immunity into absolute immunity.

Of course, it's possible that the majority's decision is not intended to have such an expansive impact. Perhaps it simply carves out a "gender dysphoria" exception to the otherwise generally applicable rules governing deliberate

---

[10] While the procedural posture of this appeal precludes consideration of Defendants' expert's opinion, I note that *even he* concludes that Clark's treatment was unreasonable. Dist. Ct. Dkt. No. 133-6 at 4 (describing Clark's treatment as "far less than ideal" and "insufficient"); *id.* at 5 (explaining that Clark should have a gender therapist in addition to her general mental health counseling); *id.* at 8 ("I agree with you that she did not have an adequate early response to her endocrine treatment and she should have had much more careful medical attention than she was getting."); *id.* at 9 (agreeing that Clark's requests for hormone treatment "were reasonable requests made repeatedly"). The most Defendant's expert does is create a dispute as to whether gender affirming surgery was medically indicated—a question not raised in this appeal. There is no basis in the record for suggesting that reasonable medical providers can disagree as to whether the course of treatment Clark actually received—or the lack thereof—was adequate.

indifference to serious medical needs and qualified immunity.  After all, it's hard to imagine that I would be penning this dissent in a case where prison officials declined to refer an inmate with a palpable lump in her breast for further tests or an evaluation by someone with experience treating breast cancer.  But that can't be.  Everyone—including the defendants' expert and defendants—concedes that Clark suffers from a serious medical condition.  And there is no principled basis in the law for carving out an exception to the protections of the Eighth Amendment for individuals suffering from one specific serious medical condition.

The majority's approach here is damaging—it turns qualified immunity into absolute immunity; makes it even more difficult for incarcerated individuals to access the medical care they are constitutionally entitled to; and paves the way for correctional facilities to deny care to an already marginalized community.  For these reasons, I respectfully dissent.